# Richmond

## TONY EDWARD LEWIS v. COMMONWEALTH OF VIRGINIA.

June 10, 1977.
Record No. 761041.
Present: All the Justices.

*William J. Rhodes, Jr.*, for plaintiff in error.

*James E. Kulp, Assistant Attorney General (Anthony F. Troy, Attorney General*, on brief), for defendant in error.

CARRICO, J., delivered the opinion of the Court.

On March 23, 1975, a riotous disturbance occurred at Southampton Correctional Center, a penal institution in Southampton County. As a result, the defendant, Tony Edward Lewis, was indicted for the murder and robbery of one prison guard, for the robbery of another guard, and for attempted escape. On January 13, 1976, a jury convicted the defendant of all the charges and fixed his punishment at death for the murder, 40 years imprisonment for the two robberies, and 5 years for the attempted escape. On April 12, 1976, the trial court confirmed the verdicts and imposed the sentences fixed by the jury.

The defendant was scheduled to die on June 15, 1976, but we granted a stay to enable him to seek an appeal. Then, on October 20, 1976, the Governor commuted the defendant's death sentence to life imprisonment. Later, we awarded the defendant a writ to consider his allegations of error concerning his convictions.

The evidence shows that on March 23, 1975, the defendant was confined in building C-1 at Southampton Correctional Center, where he was serving a 25-year sentence for a prior conviction of felony. On the same date, Officers Ronald Albert Barnes and Alfred Lynch were employees of the correctional center, assigned to building C-1.

Approximately 9:30 p.m. on March 23, Officer Barnes was attacked in the corridor of the cell block in building C-1 by an inmate, Michael Cross. Barnes was beaten into unconsciousness. When Officer Lynch attempted to aid Barnes, he was grabbed from behind and pinioned by the defendant, preventing the rescue effort. The defendant then dragged Lynch the length of the corridor to an isolation cell, forced him to unlock the door, and pushed him inside. A voice from the corridor instructed the cell's inmate, Vernon Joe, to "take everything [Lynch] had."[1] Vernon Joe removed Lynch's keys and money, threw the items into the corridor, and departed the cell.

Meanwhile, Cross had dragged Officer Barnes along the corridor toward the isolation cell. Midway, when Barnes appeared to regain consciousness, Cross hit and kicked him, and he relapsed into unconsciousness. The defendant and Vernon Joe then joined the attack upon Barnes, with the defendant kicking and "stomping" the officer. Cross removed Barnes' keys and money and handed the items to the defendant. Thereupon, assisted by Vernon Joe, the defendant dragged Officer Barnes along the corridor and threw him into the isolation cell with Officer Lynch.

Armed with Lynch's keys, Vernon Joe gained access to a master lever and opened the cell doors. Using a hammer obtained from the guard office, the defendant "beat" the padlock off a cell door not opened by the master lever.

Freed from their cells, a number of the inmates left the building. During the ensuing confusion, a guard observed the defendant and other inmates attempting to climb the 13-foot chain link and barbed wire fence surrounding the prison compound. Because unarmed, the guard merely ordered the inmates to leave the fence area. Unable to scale the fence, the defendant fell back inside the prison compound and ran.

After the tumult had subsided, Officer Barnes was transported to a Richmond hospital. The next morning, he died from his injuries.

---

[1] At the time this instruction was given, the defendant and Cross were the only inmates in the corridor, and Cross was occupied in subduing Officer Barnes some distance from the isolation cell.

## I.

### Change of Venue

■ On the day of trial, the defendant moved for a change of venue, asserting that the "publicity of the event, in all forms, is conclusively detrimental to a fair, impartial trial." After argument, the trial court denied the motion.

In arguing his motion, the defendant focused his complaint upon four articles appearing in a Norfolk newspaper generally circulated in Southampton County, the locale of the trial. The articles do not appear in the record, so we do not know their contents. The Commonwealth's Attorney, however, represented to the trial court that the articles were merely factual in nature and were non-prejudicial. The Commonwealth's Attorney asserted also that the last article appeared approximately six months before the trial date. The defendant did not then, and does not now, refute the prosecutor's representations. Furthermore, of the 24 prospective jurors examined on *voir dire*, only one had read about the case, and he disavowed any resulting prejudice.

In denying the motion for a change of venue, the trial court found the attendant publicity unlikely to influence or inflame the jury. Whether a change of venue should have been granted was a matter within the sound discretion of the trial court. Under the circumstances of this case, the court did not abuse its discretion. *Jefferson* v. *Commonwealth*, 214 Va. 747, 754, 204 S.E.2d 258, 264 (1974); *Greenfield* v. *Commonwealth*, 214 Va. 710, 716-17, 204 S.E.2d 414, 419-20 (1974).

## II.

### Jury Selection

#### (a)

■ On *voir dire* examination, the trial court asked the prospective jurors whether they had "any religious or conscientious scruples or objections against the imposition of capital punishment." One member of the panel, Tessie Grant, responded affirmatively. The court then asked Grant whether his objection was "absolute." Again, Grant answered affirmatively. Finally, when the court inquired of Grant whether, "in any proper case," he could impose the death

penalty, he replied, "No, sir." Upon challenge by the Commonwealth's Attorney, the court excused Grant for cause.

Relying upon *Witherspoon* v. *Illinois*, 391 U.S. 510 (1968), the defendant contends the trial court erred in excusing prospective juror Grant. We disagree with the defendant. *Witherspoon* stands for the proposition that a sentence of death cannot be carried out if the jury imposing or recommending the sentence is chosen by excluding veniremen simply because they voice *general* objections to capital punishment. But *Witherspoon* recognizes that a prospective juror may be excused for cause if he states that he could never vote to impose the death penalty or that he would refuse even to consider its imposition in the case before the court. *Accord, Davis* v. *Georgia*, 429 U.S. 122, 123 (1976).

Here, prospective juror Grant admitted that his objection to the death penalty was "absolute" and that he could not impose the sentence "in any proper case." It was not error, therefore, to excuse him for cause. Moreover, a *Witherspoon* error affects only the *sentence* of death and not the *conviction* for which the penalty is imposed. Because the defendant's death sentence has been commuted to life imprisonment, he cannot now rely upon the alleged error in excusing the prospective juror.

(b)

During *voir dire* examination of the jury, the defendant requested the trial court to inquire of the prospective jurors whether they could "reach a fair and impartial verdict even though the accused [was] a Negro." The court refused the request, and the defendant assigns the refusal as error.

On this precise point, the United States Supreme Court has spoken twice recently. In *Ham* v. *South Carolina*, 409 U.S. 524 (1973), the Court reversed, on due process grounds, the petitioner's drug conviction for the trial court's refusal to examine prospective jurors "as to possible prejudice against petitioner" because he was a Negro. The Court noted that the petitioner was well known in the locale of his trial as a civil rights activist and that his basic defense was that law enforcement officers were "out to get him" for his civil rights activities. But in *Ristaino* v. *Ross*, 424 U.S. 589 (1976), involving prosecution of a Negro for violent crimes against a white security guard, the Court held that, absent "racial factors such

as existed in *Ham*," 424 U.S. at 598, "the need to question veniremen specifically about racial prejudice" does not rise to constitutional dimensions. 424 U.S. at 597.

Here, it appears that the deceased victim, Officer Barnes, was white and that the defendant is black. But beyond the fact of the defendant's race, nothing appears from the record to suggest there was any likelihood racial prejudice might affect the defendant's trial. *Ristaino* applies, therefore, and we hold there was no denial of due process in the trial court's refusal of the defendant's *voir dire* request.

## III.

### *Constitutionality of the Death Penalty*

■ The defendant's principal arguments relate to the constitutionality of Va. Code § 53-291, under which the defendant was convicted and sentenced for the murder of Officer Barnes. In pertinent part, the statute was worded as follows:

"It shall be unlawful for an inmate in a penal institution as defined in § 53-9 or in the custody of an employee thereof to do any of the following:

"(1) To kill . . . such employee . . . .

" . . . .

"An inmate guilty of such killing as is mentioned in this section . . . shall be guilty of first degree murder and be punished by death . . . ." [2]

The defendant argues that because § 53-291 "provides no standards to guide a jury in determining which defendants shall live and which shall die," the mandatory death penalty prescribed by the statute is unconstitutional. This result must follow, the defendant says, from the Supreme Court's decisions in *Woodson* v. *North Carolina*, 428 U.S. 280, and *Roberts* v. *Louisiana*, 428 U.S. 325, both decided July 2, 1976, which invalidated mandatory death penalty statutes of North Carolina and Louisiana. Virginia's statute, the defendant asserts, suffers the same vice as the North Carolina and Louisiana statutes, *viz.*,

---

[2] Effective October 1, 1975, the portion of § 53-291 relating to murder committed by an inmate of a penal institution was repealed and incorporated into § 18.2-31. The portion of § 53-291 prescribing the death penalty for such murder was repealed and incorporated into § 18.2-10.

the "lack of focus on the circumstances of the particular offense and the character and propensities of the offender." *Roberts*, 428 U.S. at 333.

The Attorney General contends, however, that the commutation awarded by the Governor in this case has rendered moot the question of the constitutional validity of the defendant's death sentence. On the other hand, the defendant maintains the question is not moot. He argues that when, on October 20, 1976, the Governor issued the commutation order, there was no viable death sentence to commute. Virginia Code § 53-291 had been invalidated and his sentence of death voided, the defendant asserts, on July 2, 1976, by the decisions in *Woodson* v. *North Carolina* and *Roberts* v. *Louisiana*; therefore, when the Governor acted later to commute the sentence, the action was improper and meaningless. Accordingly, the defendant concludes, he is entitled to a new trial.

We do not agree with the defendant concerning the effect of *Woodson* and *Roberts* upon the death sentence involved in this case. We do not believe those decisions automatically invalidated Va. Code § 53-291 or immediately voided the defendant's death sentence.

At the time the defendant was convicted and sentenced, *Furman* v. *Georgia*, 408 U.S. 238 (1972), enunciated the then current view concerning capital punishment. In *Furman*, the Supreme Court had struck down certain death penalty statutes because they vested juries with unbridled sentencing discretion. *Furman*, however, did not invalidate mandatory death penalty statutes. Indeed, following *Furman*, it was believed that, because they restricted jury sentencing discretion, mandatory death penalty statutes would survive constitutional attack.

Relying upon this belief, in the interim between *Furman* and the decisions in *Woodson* and *Roberts*, this court, in *Jefferson* v. *Commonwealth*, 214 Va. 747, 204 S.E.2d 258 (1974), and *Washington* v. *Commonwealth*, 216 Va. 185, 217 S.E.2d 815 (1975), upheld the constitutionality of the very mandatory death penalty statute, § 53-291, of which the defendant now complains. Admittedly, § 53-291 is similar to the statutes struck down in *Woodson* and *Roberts* and, because of those decisions, we might, in some future case, be compelled to change our view of § 53-291 and to declare the statute invalid. But until that

action is taken directly, § 53-291 and any sentence imposed under it stand, at least presumptively, valid and enforceable.

At the time the Governor commuted the defendant's death sentence, therefore, *Jefferson* and *Washington* enunciated the law of this Commonwealth concerning mandatory death penalties and sustained the constitutional validity of § 53-291. Accordingly, the defendant's sentence of death, imposed pursuant to § 53-291, was a viable and existing sentence on the date of its commutation.

In commuting the sentence, the Governor acted pursuant to authority conferred by the Virginia Constitution, Article V, Section 12, and by statute, Va. Code § 53-228. The effect of the commutation was to substitute a sentence of life imprisonment for the death penalty, a substitution the Governor was empowered to make without the defendant's consent. *Lee* v. *Murphy*, 63 Va. (22 Gratt.) 789, 798 (1872). And, following commutation, the defendant is not "entitled to have his sentence determined anew by a jury." *Rose* v. *Hodges*, 423 U.S. 19, 22 (1975).

After commutation of a sentence of death, the penalty substituted therefor is the only sentence to be considered. In such circumstances, the defendant's status is to be viewed as though the substituted sentence, and not the allegedly invalid death penalty, had been imposed originally. *Bowen* v. *State*, 488 S.W.2d 373, 375-76 (Tenn. 1972).

In the present case, therefore, because the life term was substituted validly for a viable sentence of death, the conclusion is inescapable that the question of the constitutionality of the death penalty has been rendered moot. Accordingly, we deny the defendant's request for a new trial with respect to his sentence.

IV.

*Sufficiency of Evidence*

The remaining question concerns the sufficiency of the evidence to sustain the defendant's convictions. We deal summarily with this contention. The evidence was amply sufficient; it connected the defendant directly, either as the actual perpetrator or as an aider and abettor, with the commission of each of the offenses for which he was indicted and convicted.

For the reasons assigned, the judgment of the trial court, as modified by the Governor's commutation order, will be affirmed.

*Affirmed.*