(No. 86382.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDWARD GRAHAM, Appellant.

*Opinion filed June 19, 2003.*

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William

L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FITZGERALD delivered the opinion of the court:

Following a jury trial in the Cook County circuit court, the defendant, Edward Graham, was convicted on three counts of first degree murder. The defendant waived his right to a sentencing-phase jury, and the trial court found him eligible for the death penalty. The court then found no mitigating circumstances sufficient to preclude the death penalty and sentenced the defendant to death. That sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm the defendant's convictions.

## BACKGROUND

In the mid-1980s, the defendant met Johnny Jones, Sr. (Jones), a major Chicago cocaine distributor, while doing carpentry work for him. Eventually, the defendant began doing more lucrative work for Jones. For approximately five years, the defendant delivered cocaine to street dealers affiliated with Jones, collected drug-sale proceeds from them, and returned the money to Jones. In return, the defendant received $10,000 per month for his courier services.

Jones lived in a house on Chicago's south side with Marshall Mason and Erica Chotoosingh. Occasionally, Jones' eldest son, Johnny Jones, Jr. (Johnny), and his friend, Cory Williams, spent the night at Jones' house in second-floor bedrooms. On September 28, 1996, Johnny and Williams went upstairs to sleep around 1 a.m. An hour later, Johnny awoke to a loud thump and then heard the sound of gunfire. Johnny determined that Williams was unhurt, and together they crept downstairs. Johnny

saw the defendant shooting a handgun into Mason's bedroom. Johnny and Williams scrambled back upstairs to find a cellular telephone and call the police. According to Williams, Johnny said, "[T]hat's Ed." As they discovered that the telephone was not functioning, they heard a woman scream and more gunfire. When Johnny returned to the stairs, he saw the defendant in his father's bedroom with a handgun. The defendant fired several shots into Jones' bedroom and then crouched down and fired several more shots. The defendant fired another shot into Mason's room, grabbed a white box, and fled out the back door of the house. Johnny then locked the back door. Again, according to Williams, Johnny repeated, "[T]hat was Ed, man, that was Ed, I saw him, that was Ed." They discovered that Jones, Mason, and Chotoosingh had been shot to death, and they called the police around 3 a.m.

After leaving Jones' house, the defendant drove to a Chicago-area municipal airport, flew in a private plane to Indianapolis, Indiana, and, using an alias, flew in a commercial plane to Las Vegas, Nevada. He was arrested more than a month later by Las Vegas police officers and Federal Bureau of Investigation agents assigned to the fugitive task force. While incarcerated in Las Vegas, the defendant encountered Carl Torrence, who was being held on drug charges. Torrence asked the defendant why he had been arrested. According to Torrence, the defendant answered that he was "involved in a murder in Chicago." The defendant explained that he had visited Jones' house early one morning to drop off money. Inside the house, he smelled and saw gun smoke; Jones was dead. The defendant went home to shuttle drugs to another location, but returned to Jones' house a short time later. When he noticed Johnny standing on the stairs, he left immediately.

Torrence had a second conversation with the defen-

dant the next evening. The defendant stated that he wanted to enter a witness protection program; Torrence advised him against that strategy. At Torrence's request, the defendant described the layout of Jones' house. Torrence dismissed the defendant's suggestion that Johnny did not see who shot his father and encouraged the defendant to "come clean." According to Torrence, the defendant admitted, "Well, I did it." The defendant detailed his relationship with Jones and stated that he had been stealing money from Jones. Two days before his murder, Jones had ordered the defendant to bring him boxes containing $750,000. On the night of the murder, the defendant placed a handgun in a box and went to Jones' house. According to Torrence, the defendant stated that he shot Jones twice, shot Mason twice, and shot Chotoosingh five times as she hid under a bed. Autopsies later revealed that Chotoosingh had been shot five times, but that Jones was shot seven times and Mason three times.

Torrence had a third conversation with the defendant the following morning. The defendant asked Torrence whether the police could trace a .380 handgun to him. The gun used to shoot the victims was a .380. The defendant waived extradition and was returned to Chicago. Torrence then contacted the authorities, offering to exchange his information on the defendant for "a deal." Based on grand jury testimony from Johnny and Torrence, the State obtained an indictment against the defendant.

At trial, Johnny, Williams, and Torrence testified for the State. The defendant testified on his own behalf and told a story consistent with the story he told in his first conversation with Torrence. A jury found the defendant guilty on three first degree murder counts. The defendant waived a sentencing-phase jury. The trial court found the defendant eligible for the death penalty. After hearing

evidence in aggravation and mitigation, the court sentenced the defendant to death. This appeal followed.

## ANALYSIS

The defendant raises 11 issues: three guilt-phase issues and eight sentencing-phase issues.

An appellate issue is moot when it is abstract or presents no controversy. *People v. Blaylock*, 202 Ill. 2d 319, 325 (2002). An issue can become moot if circumstances change during the pendency of an appeal that prevent the reviewing court from being able to render effectual relief. *People v. Jackson*, 199 Ill. 2d 286, 294 (2002). While this appeal was pending, and more than two years after oral arguments, then-governor Ryan commuted the defendant's death sentence to natural life imprisonment without the possibility of parole or mandatory supervised release. Commutation removes the judicially imposed sentence and replaces it with a lesser, executively imposed sentence. *People ex rel. Johnson v. Murphy*, 257 Ill. 564, 566 (1913); Black's Law Dictionary 274 (7th ed. 1999). Thus, the commutation rendered the defendant's sentencing-phase issues moot. See, *e.g.*, *Lewis v. Commonwealth*, 218 Va. 31, 38, 235 S.E.2d 320, 325 (1977); *State v. Mitchell*, 239 Or. 87, 88, 396 P.2d 572, 573 (1964). We, therefore, address only his guilt-phase issues.

The defendant first contends that he received ineffective assistance of counsel because his trial attorney, George Howard, labored under a *per se* conflict of interest. The defendant claims that Howard previously represented Johnny, a key prosecution witness and the son of one of the murder victims, when Howard went to the police station on the night of the murders at the request of Johnny's uncle after Johnny had been taken there for questioning. We review this issue *de novo*. See *People v. Miller*, 199 Ill. 2d 541, 544 (2002).

On June 2, 1998, before jury selection began, Howard addressed an issue about which the State had concerns. Howard stated:

"[I]n this case, when this incident first happened, the uncle of the dead man or one of the deceased individuals called me and asked me if I would go to the station and see about his nephew. *** The son of one of the deceased was being questioned by the police.

So I drove to the police station pursuant to that request to see what was going on. I did not speak to the witness. I was told by the investigating officer that he was not a suspect and I said then I don't have any business here and I left."

Howard noted that, though the police initially thought Johnny may have been involved in the murders, Johnny was not a suspect by the time Howard arrived at the station. Howard continued:

"I never talked to him, I've never seen him in my life, not to know him and I never spoke to him about this case. I had, just for the record, I mentioned that to [the defendant] immediately upon being retained in this case. I said it's funny that the [brother] of the [*sic*] one of the deceased had called me and asked me to go see about his nephew at the police station at the time, so that matter was made known to [the defendant] and I wanted to—I knew myself there was no conflict because I was not involved but I did want to let [the defendant] know at least I had been in contact with the case to that extent."

The State asked Howard to confirm that he was not paid by the Jones family. Howard stated that he was "[n]ot given one dime and no contract, nothing. I went there with a view if they—if he had been a suspect I would have been retained but because I didn't see him, didn't do anything, I didn't charge him for going down there. I just said good luck and I'm gone."

The court questioned the defendant about his knowledge of Howard's contact with the Jones family. The defendant acknowledged that Howard had discussed this matter with him. The defendant stated that he had no problem with Howard continuing his representation and that he was satisfied that no conflict of interest existed "as far as Jones."

Just as no servant can serve two masters, no attorney can represent conflicting interests. See *People v. Spreitzer*, 123 Ill. 2d 1, 13 (1988); see also *Miller*, 199 Ill. 2d at 544-45. A criminal defendant's sixth amendment right to effective representation includes the correlative right to conflict-free representation. See *Wood v. Georgia*, 450 U.S. 261, 271, 67 L. Ed. 2d 220, 230, 101 S. Ct. 1097, 1103 (1981); *Glasser v. United States*, 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457 (1942); *People v. Washington*, 101 Ill. 2d 104, 109-10 (1984). Because a defendant is entitled to undivided loyalty from defense counsel, this court has adopted a *per se* conflict-of-interest rule. See *People v. Stoval*, 40 Ill. 2d 109, 112-13 (1968). Under this rule, the defendant's conviction must be reversed if (1) defense counsel has an actual or potential conflict of interest stemming from a previous or current commitment to a party with interests adverse to the defendant, and (2) the defendant does not waive the conflict. See *People v. Franklin*, 75 Ill. 2d 173, 176 (1979); *People v. Coslet*, 67 Ill. 2d 127, 133 (1977) ("allegations and proof of prejudice are unnecessary in cases where a defense counsel, without the knowledgeable assent of the defendant, might be restrained in fully representing the defendant's interests due to his or her commitments to others").

A threshold inquiry in any conflict-of-interest case is whether, in fact, defense counsel represented or represents a party with conflicting interests to those of the defendant. That is, where we have found that the defendant received ineffective assistance because of a conflict of interest, the parties did not dispute that defense counsel had a prior or current professional connection with another party. See, *e.g.*, *Washington*, 101 Ill. 2d 104 (defense counsel simultaneously represented the defendant and the municipality where he was prosecuted); *Coslet*, 67 Ill. 2d 127 (defense counsel simultaneously represented the defendant and the administrator

of the murder victim's estate); *People v. Kester*, 66 Ill. 2d 162 (1977) (defense counsel previously represented the State in its case against the defendant); *Stoval*, 40 Ill. 2d 109 (defense counsel simultaneously represented the defendant and the corporate burglary victim).

The State contends that Howard had no conflict of interest because he never represented Johnny. The defendant relies on *People v. McCauley*, 163 Ill. 2d 414 (1994), as support for his argument that Howard and Johnny shared an attorney-client relationship. In *McCauley*, an attorney received a telephone call from the defendant's family and proceeded to police headquarters, where he identified himself as the defendant's representative and asked to speak to the defendant. After a police officer declined this request, the attorney asked the officer whether the defendant had been arrested; the officer responded that the defendant was voluntarily at the station and was not the target of any investigation. The attorney then left police headquarters. The issue in *McCauley*, however, was whether the defendant's waiver of his fifth amendment privilege was valid where he was not informed that an attorney had been retained to represent him. The issue was not whether an attorney-client relationship existed; we assumed one did. Accordingly, *McCauley* does not aid our analysis.

Though we need not wade through the vagaries of contract law to determine whether an attorney-client relationship existed (see *People v. Palmer*, 141 Ill. App. 3d 234, 241 (1986), citing *People v. Grigsby*, 47 Ill. App. 3d 812, 817 (1977)), we still begin with the fundamental understanding that such a relationship is voluntary and requires the consent of both the attorney and the client (*People v. Simms*, 192 Ill. 2d 348, 382 (2000)). Because this relationship is consensual, the client must authorize the attorney to act on his behalf, and the attorney must accept this power. *Simms*, 192 Ill. 2d at 382.

Here, Howard simply had no relationship—attorney-client or otherwise—with Johnny. The record is devoid of any evidence that Johnny, a 22-year-old adult on the night of the murders, agreed to let Howard represent him, and we find no indication that Johnny's uncle summoned Howard at Johnny's behest. Further, the record is devoid of any evidence that Howard agreed to represent Johnny. At best, Howard conditionally assented to be Johnny's attorney if Johnny was a suspect. When Howard learned that Johnny was not a suspect, he left the police station. He "didn't do anything" and never charged Johnny for his time. Because Howard and Johnny had no attorney-client relationship, Howard had neither a *per se* nor an actual conflict of interest. The defendant's argument fails, and we do not reach the issue of whether the defendant waived the purported conflict.

The defendant next contends that he was denied a fair trial because, on direct examination by the State, an assistant State's Attorney testified about the defendant's invocation of his right to remain silent and, in closing arguments, the State again mentioned the defendant's post-arrest silence. We review this legal issue *de novo*. *People v. Carlson*, 185 Ill. 2d 546, 551 (1999).

Assistant State's Attorney Mike Rogers testified for the State about a custodial interview that he conducted with the defendant. Rogers summarized the defendant's description of his conduct on the night of the murders. According to Rogers, the defendant stated that he entered Jones' house, smelled gun smoke, saw the victims, and left. Rogers asked the defendant why Johnny insisted that he saw the defendant shooting a handgun inside Jones' house. The defendant responded by stating that he "didn't want to talk" to Rogers. Rogers terminated the interview.

In its closing argument, the State revisited Rogers'

testimony: "Boy, it's really hard to understand why Assistant State's Attorney Rogers had trouble believing you [the defendant] when you came up with this baloney story that you told him. He's just a fool, he's just a fool. But wait, he was smart enough to ask for his lawyer."

In *Doyle v. Ohio*, 426 U.S. 610, 619, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245 (1976), the United States Supreme Court held that the prosecution generally cannot use a defendant's post-*Miranda*-warning silence for impeachment purposes without violating due process. *People v. Dameron*, 196 Ill. 2d 156, 163 (2001). The *Doyle* rule also applies to a defendant's post-*Miranda*-warning request for an attorney. *Dameron*, 196 Ill. 2d at 163. The State correctly asserts, however, that the defendant forfeited review of this issue because he never objected to Rogers' testimony and the State's argument at trial and in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The defendant claims that review of this issue is warranted because admitting this testimony and argument was plain error. Alternatively, the defendant charges that he received ineffective assistance of counsel when Howard failed to object to this testimony and argument.

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a); see *People v. Keene*, 169 Ill. 2d 1, 9-10 (1995). The plain error rule bypasses normal forfeiture principles and allows a reviewing court to consider a putative trial error when either (1) the evidence is closely balanced or (2) the error is "so substantial that it affected the fundamental fairness of the proceeding, and remedying the error is necessary to preserve the integrity of the judicial process." *People v. Hall*, 194 Ill. 2d 305, 335 (2000). Here, the State presented strong evidence of the defendant's guilt, and the first prong of the plain error rule does not apply.

Further, "a comment upon a defendant's post-arrest silence, while improper, is not an error of such magnitude as to clearly deprive the defendant of a fair trial." *People v. Herrett*, 137 Ill. 2d 195, 215 (1990); accord *People v. Lucas*, 88 Ill. 2d 245, 252 (1981). Thus, the second prong also does not apply, and the defendant's plain error argument fails. We turn to his ineffective-assistance argument.

Ineffective assistance of counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). Under *Strickland*, a defendant must prove that defense counsel's performance fell below an objective standard of reasonableness and that this substandard performance created a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Alvine*, 173 Ill. 2d 273, 293 (1996). A reasonable probability is a probability sufficient to undermine confidence in the result at trial. *People v. Enis*, 194 Ill. 2d 361, 376 (2000). Unless the defendant makes both showings, we cannot conclude that he received ineffective assistance. See *People v. Munson*, 171 Ill. 2d 158, 184 (1996). That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient. See *People v. Griffin*, 178 Ill. 2d 65, 74 (1997).

Here, as we have noted, the State presented strong evidence of the defendant's guilt, including eyewitness testimony from Johnny. Further, Rogers' comment that the defendant "didn't want to talk" was a minor part of his testimony on direct examination. Similarly, the State's passing, though erroneous, comment that the defendant requested an attorney while speaking with Rogers was a minor part of its closing argument—one

line in 31 pages of rebuttal. Because we cannot say that the result of the defendant's trial would have been different if Howard would have objected to these comments, the defendant's argument fails.

The defendant finally contends that the State elicited, at trial, an improper prior consistent statement from Johnny during its redirect examination of Rogers. To borrow the defendant's phrase, this issue contains an "odd twist." The so-called improper prior consistent statement from Johnny was not elicited during his testimony, but during Rogers' testimony.

At trial, Johnny testified that he saw the defendant shooting a handgun into the rooms where the victims were found. On direct examination by the State, Rogers testified that he told the defendant that Johnny informed the police that he had seen the defendant "shooting people, or shooting in the house." On cross-examination, Rogers repeated that he asked the defendant, "Why is it that Johnny Jones Junior is telling me that you're shooting people in a bedroom?" The following exchange then occurred between defense counsel and Rogers:

"Q. Johnny Jones Junior didn't tell you that he saw [the defendant] shoot anybody, did he?

A. He said—well when I first talked to your client—

Q. No, no, excuse me counsel. My question is did Johnny Jones Junior tell you that he saw [the defendant] shoot anybody, yes or no?

A. He told me that he saw the defendant shoot into the room where his father and where an older gentleman was and at a bed and under a bed.

Q. My question is did he tell you that he saw [the defendant] shoot anybody, yes or no?

A. You mean actually see the person get hit with the bullet when your client pulled the trigger, no, sir.

Q. That's what it is if you see somebody shoot somebody that's what you see?

A. No, he didn't say that.

Q. Did he say that?

A. No."

On redirect examination, the State asked Rogers to repeat what Johnny had said, and Rogers replied:

"He told me that when he came down the stairs for the first time, he saw the defendant shooting into the room. *** He sees the defendant shooting I believe into the middle bedroom. That he then runs upstairs and tries to use a cell phone ***. He comes back downstairs with his friend, Cory, that he now moves down the hallway, he sees the defendant shooting over the bed and then leaning down and shooting under the bed. He loses sight of the defendant, the defendant comes back out and he's got a box in his hands. And at that point, the defendant shoots into the room where [Johnny's] father and [Mason] were found ***."

Generally, "a witness may not testify regarding an out-of-court statement made by the witness or a third person which corroborates the witness' or third person's testimony at trial." *People v. Beals*, 162 Ill. 2d 497, 507 (1994); accord *People v. Jones*, 293 Ill. App. 3d 119, 124 (1997); see M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 611.14, at 527 (7th ed. 1999) ("Where admissible, the prior consistent statement may be testified to by either the witness herself or any other person with personal knowledge of the statement"). Rogers' testimony on redirect examination about what Johnny told him corroborated Johnny's trial testimony and was therefore inadmissible. Howard, however, made no objection. Accordingly, the defendant again charges that he received ineffective assistance of counsel when Howard failed to object.

As we have noted, we cannot conclude that the defendant received ineffective assistance unless he shows both substandard performance by defense counsel and resulting prejudice. See *Munson*, 171 Ill. 2d at 184. Defense counsel's failure to object to trial testimony may be a matter of strategy and does not necessarily establish

substandard performance. *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991).

In this case, as the State correctly observes, Howard's decision not to object to Rogers' testimony was a strategic choice. Johnny's testimony that he saw the defendant shooting into the rooms where the victims were found and Rogers' testimony corroborating Johnny's testimony comported with the defense theory that Johnny did not see the defendant actually shooting the victims. In fact, Howard elicited similar testimony from Rogers on cross-examination in a successful effort to impeach him. Once Rogers had been impeached, the State simply attempted to rehabilitate him by asking him to repeat what Johnny had said. Rogers' answer on redirect was in substance identical with his answer on cross. *Cf. People v. Payne*, 98 Ill. 2d 45, 50 (1983) (a defendant who invites or acquiesces to the admission of improper evidence cannot complain). Indeed, if anyone was bolstered, it was Rogers. Because we cannot say that Howard's performance fell below an objective standard of reasonableness, the defendant's argument fails.

## CONCLUSION

For the reasons we have discussed, we affirm the defendant's convictions.

*Convictions affirmed.*