THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HENRY WATSON, Defendant-Appellant.

First District (4th Division)   No. 1—03—1131

Opinion filed March 18, 2004.—Rehearing denied April 20, 2004.

Theodore A. Gottfried, Charles M. Schiedel, and Allen H. Andrews, all of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Jon J. Walters, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Following a bench trial, Henry Watson (defendant) was convicted of first degree murder and aggravated vehicular hijacking. Prior to the sentencing hearing, defendant waived his right to have a jury determine his eligibility for the death penalty. The trial court found defendant had committed the murder in a cold and calculated manner, making defendant eligible for the death penalty. After a sentencing hearing, the trial court sentenced defendant to death. The case was appealed directly to our supreme court.

On January 11, 2003, then-Governor George Ryan commuted defendant's death sentence to a term of natural life imprisonment without the possibility of parole. On April 4, 2003, the supreme court transferred defendant's appeal to this court. On appeal, defendant argues that he is entitled to a new sentencing hearing because the State failed to prove beyond a reasonable doubt that he committed the murder in a cold and calculated manner. For the reasons that follow, we dismiss defendant's appeal as moot.

## BACKGROUND

Between November 20, 1999, and November 23, 1999, defendant left numerous messages on the answering machine of his estranged wife, Sylvia, threatening to kill her for leaving him. On November 26,

1999, defendant went to the Harvey 100 Club where Sylvia was attending an Alcoholics Anonymous (AA) meeting. After his attempts to persuade Sylvia to leave the meeting with him proved unsuccessful, defendant stood up, unzipped his coat, pulled out a gun, and shot Sylvia twice in the back of her head in front of their 10-year-old son, Henry Jr., and numerous other witnesses. Defendant then ordered the other meeting attendees to leave. Gun in hand, defendant walked out of the Harvey 100 Club, walked up to a motorist, Angela Wallace, pointed the gun at her head, and ordered her out of her car. Defendant drove off, but was arrested by the police about a block away. At the time of the arrest, the police recovered a gun from the front passenger seat.

Defendant was indicted on two counts of first degree murder, three counts of attempted first degree murder, aggravated vehicular hijacking, three counts of aggravated discharge of a firearm, aggravated battery, and unlawful use of a weapon by a felon. The State subsequently dismissed all charges except for first degree murder and aggravated vehicular hijacking.

During the bench trial, Henry Watson, Jr., testified that the day before the murder, defendant appeared outside his bedroom window at Sylvia's house, tapped on Henry Jr.'s window, and said, "Shh, I am going to kill your mama." While attempting to pry open a window, defendant was interrupted by Sylvia and Henry Jr.'s sisters. Defendant told Sylvia he had a "surprise" for her, brandished a gun, and fled.

Henry Jr. testified that on November 26, 1999, he went with Sylvia to the Harvey 100 Club to attend an AA meeting. Henry Jr. sat behind Sylvia. At around 7:30 p.m., defendant arrived at the AA meeting and sat down next to Sylvia. Defendant started to whisper something to Sylvia, but she did not respond. Henry Jr. saw defendant stand up, unzip his coat, pull out a gun, and shoot Sylvia in the back of the head twice. Defendant then ordered Henry Jr. to leave. As Henry Jr. was walking toward the door, he heard defendant tell the other meeting attendees to get out.

Outside the Harvey 100 Club, Angela Wallace was parking her car across the street. Henry Jr. saw defendant walk across the street to Wallace's car, point his gun at her head, and order her to get out of the car. Wallace complied. Defendant then got into the car and drove less than a block before the police surrounded him.

Jimmie Strong testified that he went to the Harvey 100 Club to attend an AA meeting on November 26, 1999. At approximately 7:15 p.m., Strong saw defendant walk into the meeting and whisper something to Sylvia. Sylvia appeared to be concentrating on the book that she was reading. Strong then saw defendant stand up and, in an angry tone, state, "You don't believe me ***." Strong then saw

defendant unzip his coat, pull a gun out, point the gun to the back of Sylvia's head and fire two shots. Strong then heard defendant order everybody to leave. As Strong was leaving the meeting room, he heard a third shot. Outside the Harvey 100 Club, Strong saw defendant walk across the street and pull Wallace out of her car. The next day, Strong identified defendant as the shooter in a police lineup.

Adrienne Alexander testified that she was at the Harvey 100 Club on the day of the shooting. Alexander saw Sylvia at the meeting with her son, Henry Jr. Alexander also saw defendant enter the meeting room, sit next to Sylvia, and whisper to her three times. Each time, Alexander heard Sylvia reply: "No, Henry." Defendant then stood up and said in an very angry and loud voice "Bitch, I told you." Defendant reached inside his coat, pulled out a silver gun, and raised it up. Alexander heard three shots and also heard defendant order Henry Jr. to leave the room. Defendant then told everybody "to get the fuck out." The next day, Alexander identified defendant in a police lineup at the Harvey police department.

Angela Wallace testified that, as she was parking her car across the street from the Harvey 100 Club, defendant approached her, pointed a gun at her head, and said, "bitch, get out of the car." As Wallace scrambled to get out of the car, defendant grabbed her by the coat and pulled her out. Defendant then drove away.

At trial, the State and defendant stipulated that when the defendant was stopped by Harvey police officer Steel, the murder weapon was recovered from the front passenger seat.

The parties stipulated that defendant had left many threatening messages on Sylvia's answering machine prior to the night she was killed.

The parties also stipulated that Elvia Dixon knew defendant for 20 years. On the night before the murder, defendant, Dixon, and two other people were drinking and playing cards in Dixon's apartment. Throughout the night, defendant repeatedly talked about killing Sylvia. Defendant said that he would go to the AA meeting and talk to Sylvia and, if she said one smart thing, "he would blow her brains out." Defendant then showed them a gun. Defendant left Dixon's apartment at 5:30 a.m. Before leaving, defendant told them that they would not be seeing him again because he would shoot his wife four times and then shoot himself.

At the conclusion of defendant's bench trial, the trial court found defendant guilty of first degree murder and aggravated vehicular hijacking.

During the sentencing phrase, defendant waived his right to have a jury determine his eligibility for the death penalty. The parties

stipulated that when defendant appeared at the victim's house the day before the murder, he told Henry Jr., "Shh, I am going to kill your mama." The trial court found that defendant was eligible for a death sentence because the murder was committed in a cold and calculated manner. Defendant waived his right to have a jury decide whether he would be sentenced to death.

In aggravation, the State proved that defendant was convicted of and sentenced on the following felonies: robbery on April 16, 1979, for which he received 30 months' probation and 30 days in jail; unlawful use of a weapon (UUW) by a felon on September 26, 1980, for which he received two years' imprisonment; UUW on June 10, 1982, for which he received three years' imprisonment; UUW on March 12, 1986, for which he received two years' imprisonment; robbery on March 12, 1986, for which he received four years' imprisonment; delivery of a controlled substance within 1,000 feet of a school on May 21, 1990, for which he received 6 years' imprisonment; and a 1997 conviction for domestic battery and violation of an order of protection in which Sylvia was the victim.

In mitigation, the defense presented the following stipulations: Darryl Jones would testify that defendant had a serious drug and alcohol problem; Jimmie Strong would testify that defendant had put forth a sincere effort toward rehabilitation; Anthony Wright would testify that defendant seemed to be confused and scared before the shooting; Dr. Roni Seltzberg of Forensic Clinical Services would testify that defendant was "severely character disordered, chronically chemically dependent and the product of rather dysfunctional developmental circumstances"; Joanne Glass Watson, a social worker, would testify consistent with her mitigation report (Glass's report was admitted into evidence as defense exhibit No. 7, but defendant did not include her report as part of the record on appeal); and Henry Jr. would testify that he loved his father.

After considering all the evidence in mitigation and aggravation, the trial court found insufficient mitigation to preclude the imposition of the death penalty, and sentenced defendant to death. On January 11, 2003, while defendant's conviction and sentence were on direct appeal to our supreme court, then-Governor George Ryan commuted defendant's death sentence to life imprisonment without the possibility of parole.

## ANALYSIS

On appeal, defendant argues that his due process rights were violated when the trial court found that he was eligible for the death penalty or life imprisonment for the murder of his estranged wife.

Specifically, he argues that the State failed to prove beyond a reasonable doubt that the murder was committed in a cold, calculated, and premeditated manner. He contends that, because he should not have been eligible for death or life imprisonment, he is entitled to a new sentencing hearing. He also argues, in response to the State's argument that former Governor Ryan's act of commutation renders defendant's appeal moot, that this issue is justiciable because it concerns "not his [now-commuted] death sentence but the sentence of natural life he is now serving."

■ The Illinois Constitution provides, in pertinent part, "The Governor may grant reprieves, commutations and pardons, after conviction, for all offenses on such terms as he thinks proper. The manner of applying therefore [sic] may be regulated by law." Ill. Const. 1970, art. V, § 12. Further, the separation of powers clause of the Illinois Constitution provides, "The legislative, executive and judicial branches are separated. No branch shall exercise powers properly belonging to another." Ill. Const. 1970, art. II, § 1.

The power to pardon flows from the United States Constitution alone, not from any legislative enactments, and it cannot be modified, abridged, or diminished by the Congress. *Schick v. Reed*, 419 U.S. 256, 266, 42 L. Ed. 2d 430, 438, 95 S. Ct. 379, 385 (1974). The pardoning power cannot be controlled by either the courts or the legislature. The governor's acts in the exercise of his pardoning power can be controlled only by his conscience and his sense of public duty. *People ex rel. Smith v. Jenkins*, 325 Ill. 372, 374, 156 N.E. 290 (1927). Simply put, the governor's pardoning power is essentially unreviewable. *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 480 (2004).

In this case, defendant sought a commutation of his death sentence from then-Governor George Ryan. In his "Petition for Executive Clemency," defendant requested that "his death sentence be commuted to an appropriate sentence of punishment." Governor Ryan, acting pursuant to authority conferred by the Illinois Constitution, commuted defendant's death sentence to natural life imprisonment without the possibility of parole.

■ Governor Ryan's act of commutation substituted a sentence of life imprisonment for the death penalty, a substitution he was empowered to make under both the Illinois and the United States Constitutions. See *People ex rel. Johnson v. Murphy*, 257 Ill. 564, 566, 100 N.E. 980 (1913); *Rose v. Hodges*, 423 U.S. 19, 21-22, 46 L. Ed. 2d 162, 165, 96 S. Ct. 175, 177 (1975). In *Murphy*, our supreme court characterized the effect a commutation has upon the status of a petitioner as follows:

"The petitioner is in the penitentiary not by virtue of any sentence. The sentence was done away with by [the Governor's] commutation. The punishment he is now undergoing is by the command of the Governor ***." *Murphy*, 257 Ill. at 566.

Contrary to his assertion, defendant is no longer confined in prison by virtue of any judicially imposed sentence but, rather, by the command of then-Governor Ryan, which defendant himself requested through his application for commutation. As noted by the Supreme Court:

"We therefore hold that the pardoning power is an enumerated power of the Constitution and that its limitations, if any, must be found in the Constitution itself. It would be a curious logic to allow a convicted person who petitions for mercy to retain the full benefit of a lesser punishment with conditions, yet escape burdens readily assumed in accepting the commutation which he sought." *Schick*, 419 U.S. at 267, 42 L. Ed. 2d at 439, 95 S. Ct. at 385.

Moreover, since Governor Ryan's clemency decisions were issued, the Illinois Supreme Court repeatedly has held that any and all issues raised concerning a defendant's commuted death sentence are moot. See *People v. Graham*, 206 Ill. 2d 465, 470, 795 N.E.2d 231 (2003) (finding moot the defendant's eight sentencing-phase issues); *People v. Rissley*, 206 Ill. 2d 403, 795 N.E.2d 174 (2003); *People v. Shum*, 207 Ill. 2d 47, 51, 79, 797 N.E.2d 609 (2003) (finding moot the defendant's claims that he received ineffective assistance of counsel at sentencing and that the trial court improperly denied his request to depose his trial counsel about the sentencing hearing); *People v. Moore*, 207 Ill. 2d 68, 797 N.E.2d 631 (2003); *People v. Ceja*, 204 Ill. 2d 332, 335, 789 N.E.2d 1228 (2003) (refusing to consider the defendant's challenges to the aggravation-mitigation phase of the sentencing hearing); *People v. Miller*, 203 Ill. 2d 433, 437-38, 786 N.E.2d 989 (2003) (finding moot the defendant's claim that he received ineffective assistance of counsel during the aggravation-mitigation phase of his sentencing hearing); *People v. Brown*, 204 Ill. 2d 422, 792 N.E.2d 788 (2003); *People v. Lucas*, 203 Ill. 2d 410, 418-19, 787 N.E.2d 113 (2003) (declining to consider the defendant's claim that he received ineffective assistance of counsel during his sentencing hearing because his counsel failed to investigate and call numerous witnesses during the mitigation phase). In several of the above-noted cases, the supreme court stated:

"Commutation removes the judicially imposed sentence and replaces it with a lesser, executively imposed sentence. *People ex rel. Johnson v. Murphy*, 257 Ill. 564, 566 (1913); Black's Law Dictionary 274 (7th ed. 1999). Thus, the commutation has rendered this [sentencing] issue moot. See, *e.g.*, *Lewis v. Commonwealth*, 218 Va. 31, 38, 235 S.E.2d 320, 325 (1977); *State v. Mitchell*, 239 Or. 87, 88, 396 P.2d 572, 573 (1964)." *Lucas*, 203 Ill. 2d at 419.

Because the above language is extremely brief, a review of the cases cited by our supreme court may be illuminating.

In *People ex rel. Johnson v. Murphy*, 257 Ill. 564, 566 (1913), the petitioner-defendant was convicted of murder and sentenced to be hanged by a court in Vermilion County. The petitioner-defendant successfully petitioned the governor to commute his sentence to life imprisonment. The governor ordered him confined in the Illinois State Penitentiary at Joliet at hard labor for the rest of his life. Unhappy with the prospect of a life of hard labor, the petitioner-defendant filed a writ of *habeas corpus* with our supreme court, arguing that the governor violated a statute concerning the placement of convicted prisoners when the governor ordered him placed at the Joliet penitentiary. The petitioner-defendant argued that, under the statute, he should have been sent to the penitentiary in Chester.

The supreme court found, however, that once the petitioner-defendant was sentenced to be hanged, "the action of the court ceased." *Murphy*, 257 Ill. at 566. The court defined "sentence" as an "action of a court of criminal jurisdiction declaring the consequences to a convict of the fact of guilt confessed or ascertained by verdict." *Murphy*, 257 Ill. at 566. When the governor commuted his sentence, the petitioner-defendant was no longer imprisoned by any judicially imposed sentence but, rather, by command of the governor. Had his punishment been imposed judicially, the court agreed that, under the statute, the petitioner-defendant should have been sent to Chester. *Murphy*, 257 Ill. at 566. Since the punishment was imposed by the governor as a commutation of his sentence of death, however, the governor was free to choose, without any judicial or legislative impediment, which penitentiary to send him. See *Murphy*, 257 Ill. at 567.

In *State v. Mitchell*, 239 Or. 87, 88, 396 P.2d 572, 572 (1964), the defendant had been sentenced to death for murdering his former wife's new boyfriend. The defendant appealed his death sentence, arguing that a jury instruction concerning whether he was to receive the death penalty or life imprisonment was flawed. While his appeal was pending, the Governor of Oregon commuted the defendant's sentence to life imprisonment. The Oregon Supreme Court found that the governor's act of commutation rendered the defendant's appeal moot where it was based on an alleged error in an instruction pertaining to sentencing. *Mitchell*, 239 Or. at 88, 396 P.2d at 573.

In *Lewis v. Commonwealth*, 218 Va. 31, 38, 235 S.E.2d 320, 324 (1977), the defendant killed a prison guard during a botched escape attempt, which, under the Virginia death penalty statute, mandated a sentence of death. While the defendant's challenge to the constitutionality of the Virginia statute was pending, the Governor of Virginia

commuted his death sentence to life imprisonment. The Virginia Supreme Court found that the defendant's challenge to the death penalty statute was moot because "the effect of the commutation was to substitute a sentence of life imprisonment for the death penalty." *Lewis*, 218 Va. at 38, 235 S.E.2d at 325. The court also found that the defendant was not entitled to a new sentencing hearing following the commutation. *Lewis*, 218 Va. at 38, 235 S.E.2d at 325.

It should be noted, however, that Illinois and Virginia law differ as to the status of a defendant whose sentence is commuted. Under Virginia law, the "defendant's status is to be viewed as though the substituted sentence, and not the allegedly invalid death penalty, had been imposed originally." *Lewis*, 218 Va. at 38, 235 S.E.2d at 325. Thus, Virginia law creates a legal fiction that the sentence imposed by the governor actually was imposed by the trial court.

Under Illinois law, a commuted defendant is no longer imprisoned by virtue of any judicially imposed sentence. Once the governor commutes a defendant's sentence, the punishment he currently suffers is by command of the governor. See *Murphy*, 257 Ill. at 566-67. Should he so choose, the governor may add whatever conditions he deems appropriate to the commuted sentence, even if those conditions could not have been imposed judicially. See *Schick*, 419 U.S. at 265-67, 42 L. Ed. 2d at 437-39, 95 S. Ct. at 385-86; see also *Snyder*, 208 Ill. 2d at 470-73 (explaining that a governor's pardoning power is limited only by his conscience and that his pardon may be absolute or imposed with conditions). For example, a governor could order that a defendant serve the rest of his sentence in any penitentiary in the state, even if that decision would violate the plain language of a statute. See *Murphy*, 257 Ill. at 566-67. A governor could also impose a no-parole condition upon a defendant's commuted sentence, even though a jury could have granted the defendant the possibility of parole. See *Schick*, 419 U.S. at 267-68, 42 L. Ed. 2d at 439, 95 S. Ct. at 385-86 (finding the court-martialed defendant was not entitled to a new sentencing hearing when then-President Dwight Eisenhower commuted his death sentence to life without parole even though, under the Uniform Code of Military Justice, a jury could have granted him the possibility of parole). Just as those decisions by a President or governor are not reviewable by the courts, so too is defendant's current commuted sentence of life imprisonment without parole.

Nevertheless, defendant argues that this issue is viable because it concerns his eligibility for the life sentence he is now serving. However, a review of recent post-commutation cases, where our supreme court has uniformly found that all sentencing issues are moot, shows that the issues raised by some of those defendants concerned the sentenc-

ing hearing in its entirety. See *Shum*, 207 Ill. 2d at 51; *Miller*, 203 Ill. 2d at 437-38; *Lucas*, 203 Ill. 2d at 418-19. Clearly, it is not the nature of the sentencing issue raised by a defendant on appeal that renders it moot, but rather the effect the governor's commutation has upon the nature of the defendant's sentence. Since defendant's life sentence without the possibility of parole is an executively imposed sentence, it is irrelevant that the issue he raises here "concerns not his death sentence but the sentence of natural life he is now serving."

Defendant argues, however, that the due process clauses of the Illinois and United States Constitutions guarantee him "the right to have this claim considered by this court." As noted above, under the Illinois Constitution, the governor's commutation power "cannot be controlled by either the courts or the legislature." *Jenkins*, 325 Ill. at 374. The governor is not restricted to commuting sentences to fit a statutory range enacted by the General Assembly. *Jenkins*, 325 Ill. at 376-77. The governor's commutation power is limited in that it may be exercised only "after conviction" and the manner of applying for clemency "may be regulated by law." Ill. Const. 1970, art. V, § 12; see also *Snyder*, 208 Ill. 2d 457 (interpreting the governor's commutation power under article V, section 12, of the Illinois Constitution). Of course, the governor cannot increase punishment or change the nature of a defendant's conviction. See *Schick*, 419 U.S. at 267, 42 L. Ed. 2d at 439, 95 S. Ct. at 386 (stating that "[o]f course, the President may not aggravate punishment"); *People ex rel. Fullenwider v. Jenkins*, 322 Ill. 33, 36-40, 152 N.E. 549 (1926) (holding invalid a commutation order that purported to commute a life sentence for murder to "manslaughter"). Otherwise, the governor's power may be exercised "for all offenses on such terms as he thinks proper." Ill. Const. 1970, art. V, § 12. Due process under the Illinois Constitution does not allow a court to question, review, or modify an executively imposed sentence.

Furthermore, due process under the United States Constitution does not support defendant's argument. In *Rose*, 423 U.S. at 19-20, 46 L. Ed. 2d at 164-65, 96 S. Ct. at 176, the defendants were convicted of rape and sentenced to die by electrocution in Tennessee. The Tennessee Court of Criminal Appeals affirmed the defendants' convictions, but remanded the case to the trial court for resentencing. Before the trial court could hold a resentencing hearing, the Governor of Tennessee commuted the defendants' death sentences to 99 years' imprisonment. The State then filed a petition for rehearing in the Court of Criminal Appeals. The court found that the governor's commutations were valid, held its order of remand "for naught," and affirmed the defendants' convictions and sentences as modified by the governor's commutations. Seeking new sentencing hearings, the defendants filed

a writ of *habeas corpus* arguing that the governor had illegally commuted their sentences.

The Supreme Court rejected the defendants' arguments because a "jury had already determined their guilt and sentenced them to death." *Rose*, 423 U.S. at 22, 46 L. Ed. 2d at 165, 96 S. Ct. at 177. The Court held, "If Tennessee chooses to allow the Governor to reduce a death penalty to a term of years without resort to further judicial proceedings, the United States Constitution affords no impediment to that choice. *Dreyer v. Illinois*, 187 U.S. 71[, 47 L. Ed. 79, 23 S. Ct. 28] (1902). Cf. *Schick v. Reed*, 419 U.S. 256[, 42 L. Ed. 2d 430, 95 S. Ct. 379] (1974)." *Rose*, 423 U.S. at 22, 46 L. Ed. 2d at 165-66, 96 S. Ct. at 177.

Similarly, in *Dreyer v. Illinois*, 187 U.S. 71, 83-84, 47 L. Ed. 79, 85, 23 S. Ct. 28, 32 (1902), the defendant argued that the Illinois Indeterminate Sentence Act of 1899 violated the due process clause of the fourteenth amendment of the United States Constitution because it conferred "judicial powers upon a collection of persons [the parole board] who do not belong to the judicial department, and, in effect, [invested] them with the pardoning power, committed by the Constitution to the Governor of the State." *Dreyer*, 187 U.S. at 83, 47 L. Ed at 85, 23 S. Ct. at 32.

The Supreme Court rejected the defendant's argument and held:

> "A local statute investing a collection of persons not of the judicial department, with powers that are judicial, and authorizing them to exercise the pardoning power which alone belongs to the Governor of the State, presents no question under the Constitution of the United States. The right to the due process of law prescribed by the Fourteenth Amendment would not be infringed by a local statute of that character." *Dreyer*, 187 U.S. at 83-84, 47 L. Ed. at 85, 23 S. Ct. at 32.

According to the Supreme Court, even assuming the statute improperly violated the separation of powers between the executive branch and the judiciary, "[t]he objection that the act of 1899 confers upon executive or ministerial officers powers of a judicial nature does not, in our judgment, present any question under the due-process clause of the Fourteenth Amendment." *Dreyer*, 187 U.S. at 84, 47 L. Ed. at 85, 23 S. Ct. at 32.

In light of the above, the instant defendant's status following the governor's commutation and the issue of whether this court can review defendant's new executively imposed sentence are questions which are resolved under Illinois law and not by the due process clause of the fourteenth amendment. Our supreme court has repeatedly and uniformly held that the judiciary may not infringe upon the governor's

commutation power by reviewing his decision to commute a defendant's death sentence to life imprisonment without the possibility of parole. See *Graham*, 206 Ill. 2d at 470 (finding moot the defendant's eight sentencing phase issues); *Rissley*, 206 Ill. 2d 403; *Shum*, 207 Ill. 2d at 51 (finding moot the defendant's claims that he received ineffective assistance of counsel at sentencing and that the trial court improperly denied his request to depose his trial counsel about the sentencing hearing); *Moore*, 207 Ill. 2d 68; *Ceja*, 204 Ill. 2d at 335 (refusing to consider the defendant's challenges to the aggravation-mitigation phase of the sentencing hearing); *Miller*, 203 Ill. 2d at 437-38 (finding moot the defendant's claim that he received ineffective assistance of counsel during the aggravation-mitigation phase of his sentencing hearing); *Brown*, 204 Ill. 2d 422; *Lucas*, 203 Ill. 2d at 418-19 (declining to consider the defendant's claim that he received ineffective assistance of counsel during his sentencing hearing because his counsel failed to investigate and call numerous witnesses during the mitigation phase). Moreover, in his petition for clemency, defendant requested that "his death sentence be commuted to an appropriate sentence of punishment." The governor granted his request and commuted his death sentence to a sentence of imprisonment for life without the possibility of parole. If defendant was deprived of any due process interest in having this issue reviewed, it was "only by operation of the 'process' he invoked to invalidate" his death sentence. *Sattazahn v. Pennsylvania*, 537 U.S. 101, 116, 154 L. Ed. 2d 588, 602, 123 S. Ct. 732, 742 (2003). Accordingly, we hold that defendant's challenge to the trial court's "cold and calculated" finding during defendant's sentencing hearing is moot.

Even assuming, *arguendo*, that defendant's appeal is not moot, defendant's argument has no merit.

The Illinois Criminal Code of 1961 provides that one convicted of first degree murder is eligible for the death penalty where the defendant was 18 years or older at the time of the murder and where:

> "[T]he murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." 720 ILCS 5/9—1(b)(11) (West 1998).

In *People v. Williams*, 193 Ill. 2d 1, 37, 737 N.E.2d 230 (2000), our supreme court held that "Section 9—1(b)(11) requires that the murder be 'cold,' *i.e.*, not motivated by mercy or the emotion of the moment, and that it be 'calculated and premeditated, pursuant to a preconceived, plan, scheme or design,' *i.e.*, deliberated or reflected upon for

an extended period of time." In reviewing the sufficiency of the evidence supporting a finding that a defendant is eligible for the death penalty, the standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements necessary to establish defendant's death eligibility beyond a reasonable doubt. *People v. Ramsey*, 205 Ill. 2d 287, 292, 793 N.E.2d 25 (2002).

In this case, the record shows that, in the days before he killed his estranged wife, defendant left numerous death threats on her answering machine and told their son the day before the murder, "I am going to kill your mama." On the morning of the murder, defendant stated that he would "blow [Sylvia's] brains out." Defendant then displayed the gun that he ultimately used to kill her. Thirteen hours later, defendant went to the AA meeting, sat next to Sylvia, and tried to persuade her to leave the meeting with him. When Sylvia refused, defendant executed her in front of their son. After reviewing these facts, the trial court correctly found that defendant's actions were not motivated by the emotion of the moment but, rather, that he reflected for an extended period of time upon his plan to kill Sylvia. Indeed, any rational trier of fact could have found defendant committed the murder of Sylvia in a cold, calculated and premeditated manner. See *People v. Labosette*, 236 Ill. App. 3d 846, 860, 602 N.E.2d 966 (1992) (holding the evidence supported a finding of "cold," "calculated," and "premeditated" where the defendant had 17 hours to cool off and where he had threatened to kill the victim the night before the shooting).

Defendant relies upon *People v. Carlson*, 79 Ill. 2d 564, 404 N.E.2d 233 (1980), and *People v. Buggs*, 112 Ill. 2d 284, 493 N.E.2d 332 (1986), to support his argument that the trial court erred in finding that he was eligible for the death penalty. However, as the State correctly points out, both of those cases concerned whether the trial court correctly weighed the evidence mitigating against a sentence of death, and not whether the defendant was death-eligible. The cases are, therefore, inapposite.

Based on the foregoing, we dismiss defendant's appeal as moot.

Appeal dismissed.

GREIMAN and THEIS, JJ., concur.