# Illinois Official Reports

## Appellate Court

---

### *People v. Lewis*, 2015 IL App (1st) 130171

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMUEL LEWIS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-13-0171 |
| Filed | May 12, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-8011; the Hon. Charles P. Burns, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Law Offices of Richard Dvorak, of Oakbrook Terrace (Richard Dvorak, of counsel), for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Paul J. Connery, Assistant State's Attorneys, of counsel), for the People. |

Panel JUSTICE PIERCE delivered the judgment of the court, with opinion. Presiding Justice Simon and Justice Liu concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, defendant Samuel Lewis was convicted of armed robbery (720 ILCS 5/18-2 (West 2010)) and unlawful vehicular invasion (720 ILCS 5/12-11.1 (West 2010)) and was sentenced to concurrent terms of 35 years' and 9 years' imprisonment. On appeal, defendant argues that the trial court erred in denying his motion to suppress identification because his sixth amendment right to counsel had attached when he was arrested in Nevada on a Cook County arrest warrant and brought before a Nevada court for extradition proceedings. Defendant also argues that he received ineffective assistance of trial counsel when trial counsel: (1) failed to object to evidence of other crimes; (2) introduced a photograph of defendant from an unrelated arrest; (3) failed to object to the State's emphasis on defendant's refusal to participate in a lineup; and (4) made an analogy in closing argument that compared reasonable doubt to a football game. For the following reasons, we affirm the judgment of the circuit court.

¶ 2                                                           BACKGROUND

¶ 3 On May 3, 2010, the State charged defendant with armed robbery and unlawful vehicular invasion. The State alleged that on January 20, 2010, defendant, with the help of an armed accomplice, pulled Pamela Kendall-Rijos out of her vehicle, threw her to the ground, and stole her mink coat, diamond rings and earrings, watch, purse and cell phone. The retail value of those items was over $100,000.

¶ 4 Prior to trial, defendant filed a motion to quash his arrest and suppress evidence. In the motion, defendant sought to have his arrest quashed and any evidence resulting from his arrest suppressed as "the charging document used to obtain the arrest warrant" was fatally flawed. Defendant also sought to have the victim's out-of-court identification of him stemming from the lineup suppressed.

¶ 5 At the hearing on the motion, Chicago police detective Mark Leavitt testified that he investigated the armed robbery and unlawful vehicular invasion of Kendall-Rijos. Detective Leavitt testified that Kendall-Rijos viewed a lineup and a photo array on February 18, 2010, neither of which included the defendant, but the witness did not identify anyone. Defendant later became a person of interest because he was identified by a pawn shop manager as the person who pawned two of the items stolen from Kendall-Rijos. Thereafter, on February 26, 2010, defendant was included in a photo lineup and Kendall-Rijos made a tentative identification of defendant. Detective Leavitt testified that 20 to 25 minutes after Kendall-Rijos tentatively identified defendant, she called him at the police station and stated that she was now positive that defendant was the offender.

¶ 6 After performing a background check on defendant, Detective Leavitt issued an investigative alert for defendant and contacted law enforcement in Ohio and Las Vegas. A

criminal complaint was signed by Kendall-Rijos on March 3, 2010, and an arrest warrant for defendant was issued on March 15, 2010. On April 1, 2010, defendant was arrested in Las Vegas. On April 19, 2010, Detectives Leavitt and Marszalec arrived in Las Vegas and interviewed defendant in the Clark County jail. Defendant was advised of and waived his *Miranda* rights.

¶ 7        On April 21, 2010, Leavitt and Marszalec arrived in Chicago with defendant and told him that he was going to be placed in a physical lineup. Defendant refused to cooperate and had to be physically escorted to the lineup room with his hands cuffed behind his back. Defendant was also handcuffed to the bench in the lineup room. The other individuals in the lineup put their hands behind their backs to appear consistent with defendant. At first, defendant would not lift his head. Detective Marszalec testified that he engaged in conversation with all of the individuals in the lineup so that defendant would lift up his head, exposing his face to the two-way mirror. When defendant looked up, Detective Leavitt brought Kendall-Rijos in front of the two-way mirror, and she identified defendant. The evidence technician photographed the lineup after Kendall-Rijos identified defendant, but defendant put his head back down in the photograph. Charges against defendant were approved a few hours later.

¶ 8        Detective Marszalec also testified at the hearing. He testified that defendant was uncooperative during the lineup and had to be escorted to the room in handcuffs and had to be handcuffed to the bench once inside the room. He engaged the lineup participants in conversation so that defendant would lift his face up so he could be seen through the two-way mirror. Detective Marszalec also testified that the warrant issued for defendant on March 15, 2010, appeared to be signed by Natosha Sherman.

¶ 9        The trial court denied defendant's motion, finding that neither the photo array nor the lineup was unduly suggestive, and that the detectives properly addressed any chance of suggestiveness by having the other individuals in the lineup put their hands behind their backs and by having defendant look up at the time Kendall-Rijos viewed the lineup. The trial court also found that defendant did not have a sixth amendment right to counsel during the lineup because no formal charges had been brought and defendant had not yet made his initial appearance in court.

¶ 10                                                    Trial

¶ 11        At trial, Shawn Farley testified that in January 2010 he owned the buildings at 1343 North Wells Street, 1345 North Wells Street and 1352 North LaSalle Street. The parties stipulated that the buildings Farley owned at 1343 North Wells Street and 1352 North LaSalle Street were equipped with video surveillance cameras that reliably and properly recorded the north-south alley east of Wells and west of LaSalle, and that the cameras were linked to a system that had a date and time stamp that was accurate and functioning properly. The parties also stipulated that Farley would testify that People's exhibit No. 1 was a true and accurate DVD recording of the images caught by the security cameras in the alley on January 20, 2010, that were turned over to the Chicago police department. The video was played for the jury.

¶ 12        Kendall-Rijos testified that she was pulling into her garage home at 1342 N. LaSalle on January 20, 2010, at 5:40 p.m., when she noticed "a green blur" in her rearview mirror. When she reached for her garage door remote inside of her car, she was suddenly pulled out of the car and thrown to the ground. Kendall-Rijos testified that there were two offenders; one who pulled her out of her car, and another with a gun. Kendall-Rijos identified defendant as the

offender who pulled her out of her car. Kendall-Rijos testified that she saw a van being driven past her garage in the alley and that she screamed "at the top of her lungs." Both defendant and codefendant swore at her, repeatedly threatened to kill her, and took various items, including a mink coat worth $30,000, Tiffany earrings worth $20,000, a Cartier watch worth $30,000, three diamond rings worth $60,000, a cell phone worth $400, her keys, and the garage door remote. Defendant also ripped a silver necklace with her initials "P.S.K." off of her neck but did not take it. Kendall-Rijos testified that defendant then pushed her to the ground, told her to crawl to the front of the garage without making noise, and told her they were going to come back to kill her.

¶ 13    When defendant and codefendant left, Kendall-Rijos ran into the house and yelled for her mother to call the police. When officers arrived, Kendall-Rijos described the offenders and the items that were taken from her. During her testimony, Kendall-Rijos viewed the previously published video, showing two men running out of her garage, one of the men carrying her mink coat, and getting into a Lexus sport utility vehicle (SUV). Kendall-Rijos testified that the Lexus SUV was the "green blur" in her rearview mirror, but the video did not display color. On February 18, 2010, Kendall-Rijos viewed a lineup and photo array, neither of which included defendant. Kendall-Rijos did not identify anyone. Eight days later, Kendall-Rijos identified defendant in a photo array of six individuals. On April 21, 2010, Kendall-Rijos identified defendant in a lineup with four other individuals. Kendall-Rijos testified that she was "100 percent" sure that defendant was the offender and that she did not know that anyone in the lineup was handcuffed.

¶ 14    Austin Novotney testified that on January 20, 2010, at 6 p.m., he was driving his white van through the alley where Kendall-Rijos' garage is located, and he noticed a "grayish champagne color" Lexus SUV making a three-point turn in his parking space and that he had to wait for the SUV to move. Novotney testified that the driver was a "masculine looking" African American male who was looking in the rearview mirror. Novotney testified that he parked and went inside his office, unaware of what happened to Kendall-Rijos.

¶ 15    Randy Cohen testified that he and his brother Wayne Cohen own Royal Jewelry and Loans and Royal Pawn at 428 South Clark Street. Randy testified that he sold his good friend John Rijos, Kendall-Rijos' ex-husband, the diamond that was stolen from Kendall-Rijos. The diamond was unique because of a flaw and its color. Randy Cohen also testified that his store was equipped with video surveillance and that he assisted police in retrieving a video from January 26, 2010.

¶ 16    Wayne Cohen, Randy's brother, testified that on January 26, 2010, defendant and an older male came into the store and showed him a diamond, which he recognized as Kendall-Rijos' diamond by its flaw and color, because he assisted Rijos in purchasing that diamond. Wayne called Randy to verify that it was the same diamond, then walked outside and saw defendant and the older male get into a "light greenish" Lexus and drive away. The video footage of the interaction between Wayne, defendant, and the older male was retrieved by police and played in court.

¶ 17    Jim Rosenwasser, vice president of New York Jewelers, testified that on January 21, 2010, defendant came into the store and attempted to sell a Cartier watch, but they could not agree on the price. Steven Rubenstein testified that on the next day, he was working at the store as the general manager when defendant again came into the store trying to sell the watch. Rubenstein knew defendant from approximately 5 to 10 other interactions in the store, 4 to 6 included

- 4 -

defendant offering to sell jewelry. Defendant eventually sold the watch for $7,000 and filled out a purchase form, listing an address in Cincinnati. Defendant requested to be paid in cash. On January 26, 2010, defendant returned to the store and wanted to sell a diamond engagement ring that was very bright and had a very big flaw. Rubenstein made defendant an offer of $7,000. Defendant said he was going to shop around but later returned and sold Rubenstein the diamond for $7,000. Defendant wanted to retain the mounting and wanted to be paid in cash.

¶ 18    Rubenstein testified that after those two transactions, he met with Detective Leavitt and learned that both the watch and the diamond were stolen, so he returned both items to Detective Leavitt. On March 1, 2010, Rubenstein identified defendant in a photo array as the man who sold him the watch and diamond.

¶ 19    Officer Carl Weatherspoon testified that on January 23, 2010, near 51st Street and Calumet Avenue, he observed a Lexus SUV fail to come to a stop. Officer Weatherspoon identified defendant in court as the driver of the Lexus. Officer Weatherspoon testified that he took defendant into custody after pulling him over and notified defendant's sister, the owner of the Lexus, to pick up her vehicle. Officer Weatherspoon testified that he did not want to have the vehicle impounded because there were "some expensive items in the vehicle that we weren't going to inventory. So, we thought it would be better if he had somebody pick it up. He had expensive jeans, cologne, some watches." Defendant was subsequently released.

¶ 20    Lois Lewis, defendant's sister, testified that she regularly let her 13 brothers use her Lexus SUV but that she did not lend it to defendant on January 20 or 26, 2010. Lewis further testified that she used the vehicle on January 20, 2010, to pick up her daughter from school. Lewis also testified that she changed her license plate number twice because an ex-girlfriend took her license plate, and she did not want to receive a ticket under the stolen license plate number.

¶ 21    Detective Leavitt testified that on January 20, 2010, he was assigned to an armed robbery at 1342 N. LaSalle. After receiving a description of the offenders, Detective Leavitt testified that he and an officer from the tech lab downloaded videos from the camera in the alley behind 1342 N. LaSalle.

¶ 22    On January 26, 2010, Detective Leavitt visited the Cohen brothers' jewelry store and downloaded the video surveillance onto a disk. Detective Leavitt's investigation led him to New York Jewelers, where they talked to Steven Rubenstein, who provided defendant's name, date of birth, social security number, and address. Rubenstein told Detective Leavitt that defendant sold him the Cartier watch and a 3.75-karat cut diamond, and he later identified defendant in a photo array as the person who sold him the watch and diamond. Detective Leavitt testified that when he received the Cartier watch and diamond from Rubenstein in March 2010, the serial number on the watch matched the serial number that Kendall-Rijos provided.

¶ 23    Detective Leavitt testified that on February 26, 2010, Kendall-Rijos identified defendant in a photo array. Leavitt testified that he obtained an arrest warrant for defendant on March 15, 2010, and that defendant was arrested in Las Vegas on April 1, 2010, although it does not appear in the record how defendant was apprehended. Detective Leavitt testified that he and Detective Marszalec met defendant in jail in Las Vegas. Defendant waived his *Miranda* rights and said "lay it out on the table. I know it's about a robbery." Defendant stated that he had not been in Chicago since Christmas, but when confronted about the January 23, 2010 traffic stop, defendant said he "forgot about that." Defendant did not state anything when confronted with a picture of himself in the Cohen brothers' jewelry store with a timestamp.

¶ 24    Samuel Lewis, Jr., defendant's son, testified over the State's objection to his testimony as improper character evidence and alibi evidence. Lewis Jr. testified that he was "getting into a lot of trouble" at school in January 2010, so defendant came from Las Vegas to Chicago.

¶ 25    After hearing all of the evidence, the jury found defendant guilty of both armed robbery and unlawful vehicular invasion. Defendant was sentenced to concurrent sentences of 35 years' imprisonment for armed robbery and 9 years' imprisonment for unlawful vehicular invasion. It is from this judgment that defendant now appeals.

¶ 26                                    ANALYSIS
¶ 27                              Motion to Suppress

¶ 28    Defendant's first contention is that the trial court erred in denying his motion to suppress identification. Specifically, defendant argues that his sixth amendment right to counsel attached when he was arrested and arraigned in Nevada pursuant to a Cook County arrest warrant.

¶ 29    Initially, we note that defendant has forfeited this issue for appellate review. Forfeiture of an issue occurs where a defendant fails to object to an error at trial and does not raise this issue in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Woods*, 214 Ill. 2d 455, 470 (2005). Defendant did not include this issue in his motion for judgment notwithstanding the verdict or his motion for a new trial and therefore his claim is forfeited.

¶ 30    Defendant, relying on *People v. Gonzalez*, 238 Ill. App. 3d 303, 323 (1992), and *People v. Knowles*, 76 Ill. App. 3d 1004, 1009 (1979), argues that regardless of forfeiture, because he raised the issue of ineffective assistance of counsel for failure to raise an issue in a posttrial motion, this court is compelled to address the merits of his argument. In doing so, however, defendant misstates what *Knowles* and *Gonzalez* stand for. Neither *Knowles* nor *Gonzalez* stands for the proposition that a reviewing court is compelled to address the merits of an argument where the issue of ineffective assistance is raised, in part, on the failure to raise an *issue* in a posttrial motion. Rather, both *Knowles* and *Gonzalez* stand for the proposition that review is compelled only where a claim of ineffective assistance of counsel is based upon counsel's failure to file a posttrial motion. *Knowles*, 76 Ill. App. 3d at 1009; *Gonzalez*, 238 Ill. App. 3d at 313.

¶ 31    Nonetheless, defendant argues that the issue of his sixth amendment right to counsel should be addressed under the plain error doctrine. The plain error doctrine is a narrow and limited exception to the waiver rule. *People v. Herron*, 215 Ill. 2d 167, 177 (2005). "The plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either: (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *Id.* at 186-87. "In both instances, the burden of persuasion remains with the defendant." *Id.* at 187. The Illinois Supreme Court has made clear that before a reviewing court can invoke the plain error exception, it must determine whether error occurred. *People v. Chapman*, 194 Ill. 2d 186, 225-26 (2000). We begin by reviewing for error.

¶ 32    The sixth amendment to the United States Constitution states that "[i]n all criminal prosecutions, the accused shall enjoy the right to *** have the Assistance of Counsel for his defence." U.S. Const., amend. VI. The sixth amendment right to counsel "attaches with the initiation of adversary, judicial criminal proceedings *** by way of formal charge, preliminary

hearing, indictment, information, or arraignment." *People v. Kidd*, 129 Ill. 2d 432, 448 (1989). Indeed:

> "By ensuring that a suspect is provided the right to assistance of an attorney upon the commencement of adversarial judicial proceedings, the sixth amendment protects the accused's interests when the government has committed itself to prosecute, because it is at this time that 'the adverse positions of government and defendant have solidified [and] a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " *People v. Lynch*, 234 Ill. App. 3d 141, 145-46 (1992) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)).

¶ 33  Defendant's sixth amendment right to counsel did not attach when he was arrested and arraigned for extradition proceedings in Nevada pursuant to a Cook County arrest warrant. See *People v. Young*, 153 Ill. 2d 383 (1992). An extradition hearing does not commence adversary judicial proceedings so as to constitute a critical stage triggering sixth amendment protections. *Id.* at 403. As the court recognized in *Young*:

> "Extradition is a summary and ministerial procedure for the purpose of returning a fugitive to the demanding State so that he may stand trial. [Citation.] Because the purpose is only to return the fugitive to the demanding State, the only constitutional right involved is that of personal liberty. [Citation.] Furthermore, extradition is not a judicial inquiry into the merits of a charge. [Citations.]" *Id.*

¶ 34  In light of these considerations, defendant's sixth amendment right to counsel was not triggered by his extradition from Nevada to Illinois. See also *People v. Makiel*, 263 Ill. App. 3d 54 (1994) (acceptance of representation of counsel at extradition proceeding did not invoke sixth amendment right to counsel in prosecution for murder and robbery because extradition is not part of underlying criminal case); *People v. Lynch*, 234 Ill. App. 3d 141 (1992) (defendant being named respondent in a California extradition proceeding did not cause the attachment of sixth amendment right to counsel because an extradition proceeding, unlike an arraignment, involves no inquiry into the guilt or innocence of the accused).

¶ 35  Defendant argues that the United States Supreme Court's decision in *Rothgery v. Gillespie County*, 554 U.S. 191 (2008), overrules our supreme court's decision in *Young*. In *Rothgery*, the Court stated that the right to counsel attaches when the accused is brought before a judicial officer and is told of the formal accusation against him and his liberty is subject to restriction. *Rothgery*, 554 U.S. at 202. The Court observed there that "by the time a defendant is brought before a judicial officer, is informed of a formally lodged accusation, and has restrictions imposed on his liberty in aid of the prosecution, the State's relationship with the defendant has become solidly adversarial." *Id.* The Court emphasized:

> "The rule is not mere formalism, but a recognition of the point at which the government has committed itself to prosecute, the adverse positions of government and defendant have solidified, and the accused finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law." (Internal quotation marks omitted.) *Id.* at 198.

¶ 36  Defendant argues that here, the extradition hearing in Nevada was a "critical stage" because at that point, the State had committed itself to prosecution. We disagree. This court has found that the sixth amendment right to counsel does not attach at a lineup conducted prior to the initial appearance before a judge. *People v. White*, 395 Ill. App. 3d 797, 822 (2009)

- 7 -

(recognizing that under the federal standard reaffirmed in *Rothgery*, " 'an accusation filed with a judicial officer is sufficiently formal, and the government's commitment to prosecute it sufficiently concrete, when the accusation prompts arraignment and restrictions on the accused's liberty to facilitate the prosecution' " and finding that defendant's sixth amendment right to counsel had not attached at lineup conducted prior to presentment to a judicial officer (quoting *Rothgery*, 554 U.S. at 207)).

¶ 37 Here, although defendant had presumably been brought before a judicial officer during an extradition hearing in Nevada, defendant had not yet been charged with a crime. At that point, the purpose of extradition proceedings was only aimed at transferring defendant to Illinois pursuant to an arrest warrant. Defendant makes much ado about the right to counsel not being based on mere formalism, but *Rothgery* stands for the principle that the sixth amendment right to counsel "applies at the first appearance before a judicial officer at which a defendant *is told of the formal accusation against him* and restrictions are imposed on his liberty." (Emphasis added.) *Rothgery*, 554 U.S. at 194. Because defendant was not formally accused of a crime until after he was brought back to Illinois and identified in a lineup, the extradition hearing was procedural, and thus there was no judicial involvement in adversary proceedings against him. Therefore, we reject defendant's invitation to disregard our supreme court's decision in *Young*, and we hold that the trial court's denial of defendant's motion to suppress was proper. As such, there was no error here and plain error analysis is therefore unnecessary.

¶ 38 Even if error occurred, the evidence in this case was not closely balanced and fundamental fairness was not implicated. *Herron*, 215 Ill. 2d 167. Our supreme court recently reiterated the requirements of a first-prong plain error analysis in *People v. White*, 2011 IL 109689, and held:

"Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced: that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him, *i.e.*, that the verdict 'may have resulted from the error and not the evidence' properly adduced at trial (see *People v. Herron*, 215 Ill. 2d 167, 178 (2005) (plain error)); or that there was a 'reasonable probability' of a different result had the evidence in question been excluded (see *Strickland*, 466 U.S. at 694)." *White*, 2011 IL 109689, ¶ 133.

¶ 39 Moreover, when *White* did undertake an analysis of the evidence in that case, it did so with "[a] qualitative–as opposed to strictly quantitative–commonsense assessment of the evidence." *Id*. ¶ 139. Thus, the evidence must not only be closely balanced, which it was not here, but defendant must demonstrate that the error alleged tipped the scales of justice against him, which he has failed to do. Thus, the mere existence of an error plus closely balanced evidence is not enough; there must be a relationship between the error and the result of the case. Defendant has not demonstrated that relationship here.

¶ 40 With regard to the second prong of plain error analysis, the fundamental fairness prong, our supreme court's decisions in *People v. Glasper*, 234 Ill. 2d 173 (2009), and *People v. Thompson*, 238 Ill. 2d 598 (2010), are instructive here. In *Thompson*, the court explained that under the second prong of plain error review, "[p]rejudice to the defendant is presumed because of the importance of the right involved, 'regardless of the strength of the evidence.' " (Emphasis omitted.) *Herron*, 215 Ill. 2d at 187 (quoting *People v. Blue*, 189 Ill. 2d 99, 138 (2000)). In *Glasper*, this court equated the second prong of plain error review with structural

error, asserting that "automatic reversal is only required where an error is deemed 'structural,' *i.e.*, a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " *Glasper*, 234 Ill. 2d at 197-98 (quoting *Herron*, 215 Ill. 2d at 186).

¶ 41    In *Glasper* and then again in *Thompson*, our supreme court stated that second-prong error must be structural error in order to be reversible. *Thompson* reiterated: "[t]he [United States] Supreme Court has recognized an error as structural only in a very limited class of cases. *Glasper*, 234 Ill. 2d at 198, quoting *Neder v. United States*, 527 U.S. 1, 8 *** (1999); *Johnson v. United States*, 520 U.S. 461, 468-69 *** (1997)." *Thompson*, 238 Ill. 2d at 609. Indeed, "[i]t is only for certain structural errors undermining the fairness of a criminal proceeding as a whole that even preserved error requires reversal without regard to the mistake's effect on the proceeding." *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004). "Indeed, we have found an error to be 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.' " *Neder v. United States*, 527 U.S. 1, 8 (1999) (erroneous jury instruction that omitted an element of the offense was subject to harmless-error analysis (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997))). In *Johnson*, the Supreme Court identified just six structural errors: (1) total deprivation of the right to counsel (*Gideon v. Wainwright*, 372 U.S. 335 (1963)); (2) lack of an impartial trial judge (*Tumey v. Ohio*, 273 U.S. 510 (1927)); (3) racial discrimination in the selection of grand jurors (*Vasquez v. Hillery*, 474 U.S. 254 (1986)); (4) denial of the right of self-representation (*McKaskle v. Wiggins*, 465 U.S. 168 (1984)); (5) denial of a public trial (*Waller v. Georgia*, 467 U.S. 39 (1984)); and (6) defective reasonable doubt instruction (*Sullivan v. Louisiana*, 508 U.S. 275 (1993)). The Supreme Court recently reiterated this limited list and added a seventh item: erroneous deprivation of counsel of choice. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149-50 (2006). The error alleged herein is not included in this class. But see *People v. Getter*, 2015 IL App (1st) 121307. Therefore, defendant cannot establish plain error.

¶ 42                                Ineffective Assistance of Counsel

¶ 43    Defendant additionally argues that his trial counsel was ineffective on four grounds: (1) for failing to object to evidence of "other crimes"; (2) for introducing a photograph of defendant from an unrelated arrest; (3) for failing to object to the State's emphasis on defendant's refusal to participate in a lineup; and (4) for making an analogy in closing argument that compared reasonable doubt to a football game.

¶ 44    The standards set forth in *Strickland v. Washington*, 466 U.S. 668, 690, 694 (1984), govern claims of ineffective assistance of counsel. Pursuant to *Strickland*, the defendant must establish both deficient representation by his attorney and resulting prejudice. See *People v. Manning*, 227 Ill. 2d 403, 412 (2008); *People v. Hall*, 217 Ill. 2d 324, 335 (2005); *People v. Graham*, 206 Ill. 2d 465, 476 (2003). A showing of prejudice sufficient to support a claim of ineffective assistance of counsel consists of a reasonable probability that, but for the attorney's errors, the outcome would have been different. *Hall*, 217 Ill. 2d at 336; *Graham*, 206 Ill. 2d at 476. A reasonable probability undermines confidence in the outcome. *Graham*, 206 Ill. 2d at 476. "[P]rejudice is not presumed for purposes of an ineffective assistance of counsel claim." *People v. Peterson*, 311 Ill. App. 3d 38, 52 (1999). If a claim of ineffective assistance can be disposed of because the defendant suffered no prejudice, it is not necessary to consider whether counsel's performance was deficient. *Graham*, 206 Ill. 2d at 476.

¶ 45    Defendant argues that his counsel allowed the State to introduce evidence that defendant stole expensive items leaving the jury with the inference that defendant was probably involved in other robberies. Defendant is referring to the "expensive items" Officer Weatherspoon testified were found in defendant's sister's car the day he was pulled over for a traffic stop. Defendant claims that this other-crimes evidence was irrelevant to the charged offenses and was unfairly prejudicial because it allowed the jury to infer that defendant was a habitual robber.

¶ 46    It is well established that evidence of other crimes is not admissible to demonstrate a defendant's propensity to commit a crime. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Permissible bases of admissibility of other-crimes evidence are *modus operandi*, intent, identity or motive, and common scheme or design. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *Illgen*, 145 Ill. 2d at 365-66. Other-crimes evidence is relevant when it "has any tendency to make the existence of any fact that is of consequence to the determination of [the] action more or less probable than it would be without the evidence." *Illgen*, 145 Ill. 2d at 365-66. Other-crimes evidence must bear some threshold similarity to the charged offense. *People v. Haley*, 2011 IL App (1st) 093585, ¶ 56.

¶ 47    In deciding whether to allow other-crimes evidence, the trial court must also weigh the probative value of the evidence sought to be introduced against its prejudicial effect. *Id*. ¶ 57. If the prejudicial nature of the evidence outweighs its probative effect, the evidence should be excluded. *Id*. The trial court's ruling on the admission of other-crimes evidence is reviewed for an abuse of discretion. *Id*. "An abuse of discretion occurs when the ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view." *People v. Ward*, 2011 IL 108690, ¶ 21.

¶ 48    We have reviewed the record and the alleged other-crimes evidence admitted by the State. As was established at trial, defendant was driving his sister's car when he was pulled over for not stopping at a stop sign. Officer Weatherspoon learned that the vehicle belonged to defendant's sister and understandably assumed that the "expensive" items in the trunk belonged to her. Importantly, Officer Weatherspoon testified that the reason he did not impound the vehicle was because he believed that the items in the trunk belonged to the owner of the vehicle. Thus, because the arresting officer's testimony was not other-crimes evidence, defendant was not prejudiced by defense counsel's failure to object.

¶ 49    Next, defendant argues that his counsel was ineffective for introducing a photograph from defendant's traffic offense arrest on January 23, 2010. At trial, defense counsel attempted to discredit Kendall-Rijos' sketch of the suspect by highlighting physical differences between the Kendall-Rijos sketch and defendant's photograph from the traffic stop arrest. Specifically, defense counsel sought to illustrate that Kendall-Rijos' sketch did not include any facial hair, whereas defendant's photograph from three days later depicted defendant with a full grown beard. Thus, defense counsel was attempting to illustrate that Kendall-Rijos' sketch of the suspect was not defendant due to physical differences.

¶ 50    It is axiomatic that attacking Kendall-Rijos' identification was a strategic decision. While the introduction of a photograph depicting defendant as an arrestee may not have been the most prudent avenue for what counsel was trying to achieve, it is explicit that defense counsel was using strategy to attack an eyewitness identification. We find that defense counsel's decision to introduce a photograph of defendant from his January 23, 2010 arrest at trial was not objectively unreasonable. Introduction of the photograph was pure trial strategy and, thus,

- 10 -

immune from a claim of ineffective assistance of counsel. *People v. Gilbert*, 2013 IL App (1st) 103055, ¶ 24. Therefore, defense counsel's introduction of the photograph did not prejudice defendant.

¶ 51     Defendant argues next that his counsel was ineffective for failing to object to the State's comments during closing argument. During the State's closing argument, the following colloquy occurred:

> "And then what does [defendant] do when he comes back to Chicago to stand in a lineup? Does he rationally and reasonably participate? No. He refuses to look up. He refuses to participate. Now, if you had every intention or had every belief that you weren't the person that did this, don't you think you'd sit there, let [Kendall-Rijos] look at the lineup and not recognize you? He's looking down, and he's refusing to participate because he doesn't want to be identified. You can consider that.
>
> * * *
>
> Why do you refuse to stand in a lineup? If you're innocent, stand up, man up, you've got nothing to hide especially your face. Mr. Innocent over here didn't want to leave the interview room. He had to be cuffed headed out by three men. And when he got to the lineup room, he had to be cuffed and wouldn't put up his of [*sic*] head. That's why the other three fillers had their hands their back to make this lineup fair to this guy. And he's to blame for all of it.
>
> * * *
>
> And sure enough, April 21st that's [defendant in the lineup]. Despite him trying to defeat an identification because of this outrageous conduct that started back in Vegas.
>
> * * *
>
> [Kendall-Rijos] was corroborated by [defendant's] refusal to lift his head … his obstructions of justice literally is what they were [*sic*] at the line up that corroborates here.
>
> * * *
>
> When you come out, ladies and gentlemen, with the only true just verdict in this case that this man is guilty of both crimes you can hold your heads up high while he keeps his down low. Thank you, Judge."

¶ 52     Generally, a prosecutor is given wide latitude in closing arguments. *People v. Page*, 156 Ill. 2d 258, 276 (1993). This includes commenting on the evidence and drawing any legitimate inferences from the facts in evidence, even if they are unfavorable to the defendant. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). It is improper for a prosecutor to make comments irrelevant to the question of guilt or innocence and that only serve to inflame the jury's passions against the defendant. *Blue*, 189 Ill. 2d 99. Prosecutorial misconduct warrants reversal only if it caused substantial prejudice to the defendant, taking into account the content and context of the comments, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. *Id*. The trial court may cure any errors by giving the jury proper instructions on the law to be applied, informing the jury that arguments are not evidence, or sustaining the defendant's objections and instructing the jury to disregard the inappropriate remark. *Id*.

¶ 53     Defendant concedes that this court has held that evidence demonstrating a defendant's refusal to participate in a lineup is admissible evidence (*People v. Shanklin*, 367 Ill. App. 3d

569, 578 (2006)), but argues that trial counsel was ineffective for failing to object to the State's over emphasis of defendant's refusal to participate. The State responds that the statements in closing argument fell within the wide latitude the prosecution is granted in closing arguments. *People v. Goins*, 2013 IL App (1st) 113201, ¶ 84. The State also argues that the lineup identification was potentially the most important piece of evidence at trial and, therefore, it was proper to illustrate defendant's consciousness of guilt by commenting on his refusal to participate.

¶ 54    Our review of the record and of the closing argument as a whole leads us to conclude that the State's comments during closing argument were not objectionable and therefore defense counsel was not ineffective for failing to object to the State's comments in closing argument. The State's emphasis on defendant's refusal to participate in the lineup fell within the wide latitude the prosecution is granted in making its closing arguments. *Id*. While there were many references to defendant's refusal to participate in the lineup, they were based on the evidence and reasonable inferences drawn therefrom. Therefore, defendant did not suffer prejudice as a result of counsel's failure to object.

¶ 55    Lastly, defendant contends that his trial counsel was ineffective because he gave an unreasonable closing argument. *People v. Lee*, 185 Ill. App. 3d 420 (1989). Specifically, defendant argues that his trial counsel's discussion of reasonable doubt, including the use of an analogy comparing the reasonable doubt standard to a football game, fell below the objective standard of reasonableness. At trial, defense counsel stated that in a civil case "[t]hey have to take it past the 50 yard line," referring to the burden of preponderance of the evidence, but for a criminal case "[i]t's beyond a reasonable doubt, so it's beyond the 50 yard line. You have to take it to the opponent's 20, the red zone. You got to get it in the red zone for beyond a reasonable doubt."

¶ 56    At the outset, we conclude that defense counsel's closing argument fell below the objective standard of reasonableness required by the first prong of the *Strickland* test. However, defendant suffered no prejudice where the trial court's jury instructions following closing arguments cured any potential confusion regarding reasonable doubt. Additionally, there was overwhelming evidence of defendant's guilt, mainly, Kendall-Rijos' unimpeached eyewitness identification, the testimony and video surveillance illustrating how defendant went from store to store trying to sell Kendall-Rijos' jewelry, and defendant's interview with Chicago police detectives in Nevada.

¶ 57    Defendant's reliance on *People v. Downs*, 2014 IL App (2d) 121156, *appeal allowed*, No. 117934 (Ill. Sept. 24, 2014), is misplaced. In *Downs*, this court addressed whether the trial court committed plain error by erroneously defining "reasonable doubt" in response to a question from the jury. The jury, during deliberations, sent a question to the trial court asking " '[w]hat is your definition of reasonable doubt[:] 80%[,] 70%[, or] 60%?' " *Id*. ¶ 17. After consulting with the State and defense counsel, the trial court sent a written response " '[w]e cannot give you a definition[;] it is your duty to define.' " *Id.*

¶ 58    On review, the court began its analysis by announcing that it is "well-established in Illinois that the term 'reasonable doubt' is self-defining and does not need any further defining in court instructions." *Id.* ¶ 22 (citing *People v. Speight*, 153 Ill. 2d 365, 374 (1992)). The court also observed that the Illinois Pattern Jury Instructions recommend that no instruction is given defining the term "reasonable doubt." *Downs*, 2014 IL App (2d) 121156, ¶ 22. Thereafter, the court analyzed two prior cases from other districts that had addressed similar circumstances. In

*People v. Turman*, 2011 IL App (1st) 091019, the jury asked the trial court for "a 'more explicit, expansive definition of reasonable doubt.' " *Id.* ¶ 19. The trial court answered that "[i]t is for the jury to collectively determine what reasonable doubt is," which the reviewing court in *Turman* held was error. *Id.* ¶¶ 19, 25. Likewise, in *People v. Franklin*, 2012 IL App (3d) 100618, the trial court, during jury selection, defined "reasonable doubt" as " 'what each of you individually and collectively, as 12 of you, believe is beyond a reasonable doubt.' " *Id.* ¶ 4. The reviewing court held that the trial court's answer violated the prohibition in Illinois against defining "reasonable doubt," and therefore, error had occurred. See *id.* ¶ 27. The court summarized both *Turman* and *Franklin* as focusing on two dangerous foreseeable scenarios: "that the jury is to collectively determine the meaning of reasonable doubt, and *** the danger that the jury will convict a defendant on proof that did not meet the reasonable-doubt standard." *Downs*, 2014 IL App (2d) 121156, ¶ 27.

¶ 59    In sum, the *Downs* court concluded the instruction as meaning that the jury was to collectively define reasonable doubt and that the risk that the jury might have used a standard less than reasonable doubt was "manifest." *Id.* ¶ 28. Specifically, the court noted that "there [was] no plausible interpretation of the trial court's written instruction other than as a command to define the term according to the jury's collective decision." *Id.* The court also remarked that because the jury was to quantify "reasonable doubt" in terms of percentages, percentages the court deemed to be "disturbingly low," it was likely that the jury used a lesser standard. *Id.* Thus, the court held that error had occurred and also held that defendant satisfied the second prong of a plain error analysis. *Id.* ¶ 39.

¶ 60    Here, the facts of this case are distinguishable from *Downs*. While we acknowledge that both cases involve the potential use of percentages to define reasonable doubt, *Downs* dealt with the court's response to a jury question posed during deliberation. The complained-of error here occurred before the jury was properly instructed. The jury instructions in this case properly identified the standard of reasonable doubt and any possible error was cured by those instructions. We therefore cannot find that defendant suffered prejudice as a result of counsel's closing argument.

¶ 61    We have considered, and rejected, each of defendant's claims of ineffective assistance of counsel on appeal. We are unpersuaded by defendant's claims of ineffective assistance of counsel, even considering his arguments cumulatively. *Strickland*, 466 U.S. at 690, 694.

¶ 62                                  CONCLUSION

¶ 63    Accordingly, for the reasons set forth above, we affirm the judgment of the circuit court of Cook County.

¶ 64    Affirmed.