NOTICE

Decision filed 09/10/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 170447-U

NO. 5-17-0447

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 16-CF-470 |
| | ) | |
| STEVEN A. WILLIAMS, | ) | Honorable |
| | ) | Kyle A. Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's convictions for aggravated battery to a child are affirmed where his convictions did not violate the one-act, one-crime doctrine; where the State proved him guilty beyond a reasonable doubt; and where he was not denied effective assistance of counsel.

¶ 2    This is a direct appeal from the circuit court of Madison County.  The defendant, Steven A. Williams, was convicted of five counts of aggravated battery to a child.  On November 17, 2017, he was sentenced to a total of 30 years' imprisonment followed by 3 years of mandatory supervised release (MSR).  The defendant raises three points on appeal: (1) that three of his convictions should be vacated pursuant to the one-act, one-crime doctrine, (2) that the State failed to prove one of the charges against him beyond a

1

reasonable doubt, and (3) that he was denied effective assistance of counsel. For the reasons that follow, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4    On August 31, 2017, the defendant was charged by second amended indictment with five counts of aggravated battery to a child (720 ILCS 5/12-3.05 (West 2016)), relating to events that occurred on or about February 14 and February 23, 2016. As to each of the five counts, it was alleged that the defendant was over the age of 18, that the child, S.W., was under the age of 13, and that the defendant knowingly and without legal justification caused great bodily harm while committing a battery. Count I alleged that the defendant "caused trauma to S.W.'s body" on or about February 14, 2016, causing S.W. to sustain rib fractures. Counts II and III alleged that the defendant "shook S.W." on or about February 23, 2016, causing him to sustain a "subdural hemorrhage" and "a bilateral hemorrhage of the eyes," respectively. Counts IV and V alleged that the defendant "caused trauma to S.W.'s body" on February 23, 2016, causing S.W. "to sustain rib fractures" and "a lacerated liver," respectively.

¶ 5    On September 19, 2017, the defendant's three-day jury trial commenced. During opening statements, the State explained that the defendant was facing five counts, one for each injury that S.W. sustained.

¶ 6    The State first presented testimony of Master Sergeant Christopher Hoffstot, who had been a police officer for 18 years at the time of trial. In February 2016, Hoffstot was part of the Violent Crimes Division, a supervisor in the Metro East Major Case Squad, and an active member of the Child Death Task Force. Hoffstot testified that on February 23,

2016, at approximately 11:15 a.m., he picked up S.W.'s mother, Tierra Banks-Fair, at her apartment in Collinsville and transported her in an unmarked vehicle for a court appearance in St. Clair County. When Hoffstot picked Tierra up to transport her to the courthouse, he asked Tierra who would be taking care of S.W. while she was gone. Tierra responded that the defendant, who was S.W.'s father, would be watching the child.

¶ 7 After the court appearance, Hoffstot drove Tierra back home at approximately 3:45 p.m. When they were just a few miles from the apartment, she received a phone call from the defendant. Hoffstot testified that during the initial phone call, he observed Tierra become excited and upset, start crying, and yell, "what's wrong with my baby, what's wrong with my baby." The phone call ended, and Hoffstot asked what was going on. Tierra was still upset when she received a second phone call from the defendant, and she screamed out, "my baby's not breathing." Then, she asked the defendant repeatedly, "where are you?" To Hoffstot's knowledge, Tierra never received an answer, so the officer drove as fast as he could to Tierra's apartment.

¶ 8 Once Hoffstot and Tierra arrived at her apartment, they realized the defendant was not there. Within a minute after arriving, the defendant pulled up in his red Pontiac Grand Prix and parked his vehicle behind Hoffstot's car. Tierra exited Hoffstot's vehicle, ran to the passenger side of the defendant's Grand Prix, and retrieved S.W. from the back seat. Hoffstot testified that S.W. was limp, covered in white vomit, and appeared to be lifeless. As Hoffstot exited his vehicle, he yelled at Tierra to stop, so that he could assist the child. Instead, Tierra got into the defendant's front passenger seat, and the defendant sped away. Hoffstot then returned to his vehicle and attempted to locate them. Hoffstot eventually

3

caught up to the Grand Prix while it was stopped at an intersection. He walked up to the passenger side of the defendant's vehicle, opened the door, grabbed S.W. from Tierra, and started assessing the child's condition.

¶ 9    Hoffstot testified that at this point, S.W. still appeared lifeless, his eyes were open and fixed, and he was covered in vomit. Hoffstot laid S.W. down in the back seat of the defendant's vehicle where Hoffstot checked S.W. for a pulse, which was faint, and determined that S.W. was not breathing. Hoffstot instructed the defendant to call 9-1-1, while Hoffstot began performing "rescue breaths" on S.W. The defendant had not called 9-1-1, and Hoffstot instructed the defendant to call 9-1-1 again. This time the defendant complied. Eventually, S.W. started to breathe and blink again. The defendant's 9-1-1 call was played for the jury.

¶ 10   An ambulance and the Collinsville Police Department arrived on scene shortly thereafter. Once S.W. was placed inside the ambulance, Hoffstot could hear S.W. crying. The officer followed the ambulance to the Oliver Anderson Hospital in Maryville. Upon arrival at the hospital, Hoffstot spoke with both the defendant and Tierra. The defendant asked if S.W. had suffered from a seizure; Hoffstot said he did not know, as he was not a doctor. A short time later, S.W. was airlifted to a hospital in St. Louis, Missouri. The Collinsville Police Department then took over the investigation into how S.W. was injured, and Hoffstot was no longer involved in the case.

¶ 11   Tierra testified that she was the mother of S.W., who was born on December 14, 2014. For approximately two months prior to S.W. going to the hospital, Tierra had been living in the same apartment as the defendant. S.W. also lived with them. The defendant

4

was Tierra's boyfriend. Prior to the living situation that existed at the time of the events giving rise to this appeal, Tierra, the defendant, and S.W. lived with Tierra's sister, Tatanisha, and her boyfriend, Lamontric Wayne, in an apartment on the same street.

¶ 12 On February 23, 2016, Hoffstot drove Tierra to court at around 11 a.m., leaving S.W. home alone with the defendant. The plan was for the defendant to drop S.W. off at Tatanisha's house, where she and their other sister, Taquela, had agreed to watch S.W. Both Tierra and the defendant had to appear in court the same day, but for unrelated matters. Tierra testified that it was common for her sisters to babysit S.W., and that she would watch their children as well. Tierra indicated she would never leave S.W. with anyone who would hurt him. Similarly, Tierra told police officers at the hospital that she did not think her sisters had done anything to harm S.W.

¶ 13 Tierra's testimony of what took place after her court appearance on February 23, 2016, corroborates Hoffstot's testimony. Tierra testified that she and Hoffstot were heading back to her apartment at around 3 p.m. when she received multiple phone calls from the defendant. The defendant told Tierra that she needed to hurry up and get home because something was wrong with S.W., and S.W. was throwing up. (The night before, S.W. had also vomited.) Tierra did not perceive the situation to be an emergency until she received another phone call from the defendant, who was crying, yelling, and urging her to get home as fast as possible because S.W. was sick. The defendant said he was leaving to take S.W. to the hospital.

¶ 14 About two minutes later, Hoffstot and Tierra arrived at her apartment, but the defendant was not there. Tierra called the defendant, and shortly thereafter, he "came

flying down the street." The defendant "opened up the car and he had [S.W.] on his lap." When Tierra reached for S.W., he instantly started throwing up. Tierra jumped into the defendant's vehicle with S.W., and the defendant started driving to the hospital. Hoffstot caught up to them while they were stopped at an intersection and said that S.W. was not going to make it. Hoffstot performed CPR on S.W., and the defendant called 9-1-1. A short time later, an ambulance arrived and took S.W. to Anderson Hospital. S.W. was subsequently airlifted to Cardinal Glennon Hospital.

¶ 15   Tierra testified that S.W. had brain surgery shortly after he arrived at Cardinal Glennon. S.W. was hospitalized for almost two months. He had to undergo an additional surgery to remove a portion of his skull and replace it with a plate.

¶ 16   With respect to S.W.'s injuries giving rise to count I, Tierra testified that on February 16, 2016, about two weeks prior to S.W.'s hospitalization, she was giving him a bath when she noticed that S.W. had "unusual bruises" on both sides of his body. Tierra took pictures of these bruises and sent them to the defendant via text message. Tierra asked if the defendant knew what had happened to S.W. to cause such bruising, since he had been with the defendant before the bruises appeared. Tierra indicated that the defendant became upset and defensive when asked about the bruises. On cross-examination, Tierra said she believed the defendant became defensive because he thought she was accusing him of harming S.W. and not telling her about it.

¶ 17   On March 28, 2016, Tierra was interviewed by Detective Christopher Warren with the Collinsville Police Department. Tierra recalled the conversation she had with the defendant through text messages and over a telephone call about the bruises she had seen

on S.W. The State questioned Tierra about what she told Warren regarding the bruises. Tierra said she told Warren that she held the defendant's hand up to the bruises, and she also told Warren that the bruises looked like someone had been punching S.W. Additionally, Tierra testified that it was unusual that the defendant did not tell her about the bruises because he would typically tell her if something happened to S.W. Tierra further indicated that she had never harmed S.W.

¶ 18 On cross-examination, Tierra testified that S.W. had fallen down the stairs less than two months before the date of the injury in this case. Additionally, S.W. fell in the bathroom about two weeks prior to the hospital visit, but after she noticed the bruises on his body. Tierra testified that S.W. tripped over her foot and hit his head on the toilet. Tierra did not immediately take S.W. to the hospital because she did not see any marks on his body, and he seemed fine. However, she subsequently noticed a soft spot, and the doctors determined that S.W. had a fractured skull. When asked why she did not bring S.W. to the hospital sooner after the fall, Tierra responded that she did not know it was that serious because she did not see any marks on his body.

¶ 19 Also on cross-examination, Tierra testified that about two weeks before February 23, 2016, she noticed bruises on S.W. She called the defendant, sent him pictures of the injury, and continued the conversation via text messages. During the text conversation, the defendant became defensive. However, Tierra testified at trial that she was not accusing the defendant of harming S.W., and the text messages did not explicitly accuse the defendant of harming S.W. While testifying, Tierra asked, "Why would I want [the

defendant] to get in trouble for something that we don't know what happened, we don't know who did it." Tierra and the defendant were still together at the time of trial.

¶ 20    Next, the jury heard testimony from Detective Keith Jackson of the Collinsville Police Department, who was a member of the major case squad and the Child Death Task Force. Jackson testified that on February 23, 2016, he received a phone call from Officer Warren, who was on his way to Cardinal Glennon to conduct interviews in reference to this case. Warren asked Jackson to assist in the interviews. Upon his arrival at the hospital, and prior to conducting any interviews, Jackson learned that S.W. had a brain bleed and that his injuries were consistent with abuse. A short time later, Jackson and Warren conducted several interviews. First, the defendant and Tierra were questioned because they had recent contact with S.W. As a result of those interviews, Jackson indicated he learned that Taquela and Tatanisha, and Lamontric had also been with the child. They were all questioned. Jackson learned through the interviews that the defendant was the last person who had contact with S.W. before the child was taken to the hospital. The defendant's interview was recorded and played for the jury.

¶ 21    During the interview, the defendant informed the detectives that he had been awake for nearly 32 hours when he picked S.W. up on the afternoon of February 23, 2016. The defendant indicated that as soon as he arrived at his apartment after picking S.W. up from Tatanisha's apartment, he noticed S.W. was short of breath and his eyes were rolling into the back of his head. The defendant admitted to shaking S.W. at least twice. The defendant also stated that he did not believe Taquela had caused S.W.'s injuries.

¶ 22 Tatanisha Fair also testified. Tatanisha is the sister of Tierra and Taquela. Tatanisha stated that in February 2016 she was living in an apartment in Collinsville with her children and her boyfriend, Lamontric Wayne. Tatanisha testified that on February 23, 2016, she, Lamontric, and Taquela agreed to babysit S.W. at Tatanisha's apartment while the defendant and Tierra went to court. The defendant dropped S.W. off at the apartment around 11 a.m. or noon. Tatanisha stated that S.W. appeared normal that day until he threw up "a whole bunch of fluid." After S.W. threw up, he took a nap, and when he woke up, he played "like normal." While they were watching S.W., Lamontric was playing a video game on the second floor of the house, and Tatanisha was watching the video game and the children at the same time. At around 2 or 2:30 p.m., Tatanisha and Lamontric left their apartment to go pick up Taquela's son from school. S.W. was left alone with Taquela and Tatanisha's two-month-old daughter. When Tatanisha left, S.W. appeared to be fine. Tatanisha testified that she did not see anyone abuse S.W., and she did not see S.W. fall or have any sort of accident that day.

¶ 23 Lamontric testified that on the afternoon in question, S.W. appeared "regular," ate something, threw up, and then went to sleep. Lamontric also confirmed that he was playing video games while S.W. was moving between rooms, and up and down stairs. Lamontric did not see any injuries on S.W. while he was at the apartment that day. Although Lamontric admitted his recollection of that day was "kind of foggy," he stated he did not always have visual contact with S.W. Lamontric testified that he never touched S.W., he never witnessed Tatanisha or Taquela strike S.W., and he never saw S.W. hurt himself.

¶ 24    Taquela similarly testified that S.W. acted normal when he arrived at Tatanisha's apartment on February 23. Taquela testified that S.W. was crying, wanting attention, and "just being an ornery baby." She did not see any injuries on S.W. but confirmed that S.W. vomited before he napped. Taquela testified she never put her hands on S.W. that day, she did not see anyone else shake or strike S.W., and she did not witness him fall down or injure himself in any way that day. Taquela, however, admitted that she did not take off S.W.'s clothes to see whether or not there were any markings or noticeable injuries on S.W.'s body. In support of her testimony, Taquela identified various "snapchat" photographs she had taken of S.W. and Tatanisha's daughter.

¶ 25    Dr. Linda Shaw, a pediatrician who worked in the St. Louis University School of Medicine, Department of Pediatrics' division of child protection, testified at the defendant's trial. Dr. Shaw was also employed by Cardinal Glennon. As part of her job duties, Dr. Shaw evaluates children in situations where abuse or neglect was suspected. Dr. Shaw testified that on February 23, 2016, shortly after S.W. arrived in the emergency room at Cardinal Glennon, a social worker and the trauma service notified Dr. Shaw that she needed to consult on S.W.'s case. Dr. Shaw completed her evaluation, which included reviewing S.W.'s medical records, attempting to speak to S.W.'s parents, examining S.W., and reviewing studies and reports that had been performed during S.W.'s care. Dr. Shaw indicated that in S.W.'s case, there were various departments within Cardinal Glennon that all worked together in treating and caring for S.W.'s injuries, including the trauma team, the intensive care unit team, a social worker, a neurosurgeon, a neurologist, a nutritionist, the child protection division, radiologists, and the imaging department.

¶ 26    In conducting an evaluation of a child admitted into the pediatric intensive care unit, Dr. Shaw testified that she generally looks for things that would help her understand what caused the child's injuries, whether there was an explanation for what has happened to the child, and his or her past medical history, among other things. In this case, Dr. Shaw observed an injury to S.W.'s head, that included blood around the brain and surrounding tissues, and an injury to the brain tissue itself. As a result of these injuries, S.W. had to be intubated, *i.e.*, a tube had to be inserted into his mouth so that a respirator breathed for S.W. because he could not breathe on his own. Additionally, there was hemorrhaging, or bleeding, into the back of S.W.'s eyeballs, injuries to the soft tissues of S.W.'s neck, and swelling of the ligaments and connective tissues around the bones near the top of S.W.'s neck. Finally, the diagnostic imaging allowed Dr. Shaw to observe rib fractures and a laceration on S.W.'s liver.

¶ 27    Dr. Shaw testified about each of the five injuries giving rise to the charges against the defendant. A computed tomography (CT) scan of S.W.'s head revealed pressure that shifted the brain tissue from one side to the other, such that it required part of the bone on S.W.'s scalp to be removed in order to relieve the pressure and drain some of the blood surrounding S.W.'s brain. Dr. Shaw testified that this type of injury to a 14-month-old child usually occurs in the following situations: a significant motor vehicle accident; falling down several flights from a tall building; or some other type of significant accident in which the child's head is suddenly accelerated and then instantly decelerated, causing the child's head to rotate on the neck, back and forth, with great force, such as someone shaking the child.

11

¶ 28    Dr. Shaw further testified that she immediately suspected S.W. was abused because there was no significant accident presented to explain S.W.'s configuration of multiple injuries to different areas of the body. Initially, S.W.'s prognosis was not good, and there was concern that the child might not survive. Moreover, Dr. Shaw explained that it would be very unusual, and unlikely, for S.W. to have sustained this combination of injuries merely from falling down some stairs, or from bumping his head on something.

¶ 29    Dr. Shaw explained that S.W. suffered bilateral retinal hemorrhages in both eyes, which meant that both of his eyes had widespread bleeding through all of the layers of the retinas. As with his head injuries, this type of eye injury would typically be caused by acceleration or deceleration, as in a significant accident. Dr. Shaw testified that S.W.'s eye injuries could have been caused by someone shaking him. She suspected that these injuries were the result of child abuse because there was no other plausible explanation.

¶ 30    With respect to the laceration of S.W.'s liver, Dr. Shaw testified that this type of injury could cause vomiting. This kind of injury would also explain S.W.'s random vomiting in the weeks and days leading up to his hospitalization. She further explained that this type of injury is caused from something impacting the child's abdomen with force, such as the child being kicked, punched, or stomped in, or on, the abdomen.

¶ 31    Dr. Shaw testified that S.W. had five rib fractures, and the radiologists who treated S.W. indicated that the three fractures on the left side were likely more than one week older than the two fractures on the right. The two, separate injuries to the ribs were relevant to counts I and IV of the indictment, respectively. Dr. Shaw testified that the "radiologists do the best job they can to describe [the injuries revealed] as newer or older." She opined that

12

it was very unlikely that S.W. sustained the rib fractures on both sides of his rib cage from a fall, as rib cage fractures are rarely seen from falling, and that she "rarely see[s] rib fractures in children, period." Moreover, even if a child were to have suffered rib fractures from a significant fall, Dr. Shaw would have expected the fractures to appear on just one side, not on both. Dr. Shaw explained that pain from rib injuries could also cause a child to vomit. When shown the pictures Tierra took on February 16, 2016, Dr. Shaw observed bruises on S.W.'s right and left chest and thorax, which were around the area of the rib cage. She opined that injuries to those areas of a child's body are not usually caused by accidents.

¶ 32    The defendant testified in his own defense at trial. Specifically, the defendant testified that he dropped S.W. off at Tatanisha's house, and that he was in court from approximately 1 p.m. to 3 p.m. He then picked up his son, S.W., and put him in the car seat in the back. By the time they arrived home, the defendant noticed that S.W.'s eyes were rolling back into his head. The defendant was stressed because he did not know what was going on, or how to help his son. S.W. was slumped, with his eyes in the back of his head. The defendant tried to help by running cool water over his son's face. The defendant also tried to provide first aid for a seizure by sticking his finger, and a spoon, in S.W.'s mouth. The defendant called S.W.'s name, and shook him, to try to get him to respond. At this point, the defendant was panicking, and S.W. had "white stuff" coming out of his nose and mouth. The defendant similarly explained that he called Tierra. She subsequently got into his car, and Hoffstot assisted S.W. while they were in traffic. S.W. was ultimately taken to the hospital.

¶ 33 The defendant further testified that after S.W. was admitted for emergency surgery, the police and doctors explained to the family that S.W. had suffered trauma, and they suspected abuse. The officers then interviewed the family members. The defendant admitted that he shook his son to get him to come to his senses, not to hurt him. The defendant said he shook S.W. twice. The defendant also testified that he did not inform police that S.W. had recently fallen down the stairs because he "didn't know that was a problem *** at that time. It was a different date. I didn't know."

¶ 34 During closing arguments, the State argued that the defendant shook S.W. The State asserted, "We don't have to prove how the injuries happened. We don't have to prove whether it was a kick, whether it was a punch, whether it was a squeeze, or a stomp, whether [S.W.] was violently shaken, whether he was thrown. We don't have to prove how it happened." In response, defense counsel argued that no one knew who injured S.W., and the detectives did not try hard enough to determine what happened. Defense counsel maintained that the defendant was only trying to save his son's life.

¶ 35 After closing arguments, the trial court instructed the jury, *inter alia*, that: "The indictment states that the offense charged was committed on or about February 14, 2016, and on or about February 23, 2016. If you find the offense charged was committed, the State is not required to prove that it was committed on the particular date charged." The defendant did not object to the foregoing instruction. The jury found the defendant guilty on all counts.

¶ 36 On October 26, 2017, the defendant filed a "posttrial motion for new trial" alleging, in part, that the evidence at trial was not sufficient to prove him guilty beyond a reasonable

14

doubt.  The defendant also argued that the trial court erred in allowing certain photographs into evidence that depicted the injuries suffered by S.W.  On November 17, 2017, a hearing was held on the posttrial motion.  After argument, the court denied the defendant's motion for a new trial.  A sentencing hearing was then held, and the defendant was sentenced to 6 years' imprisonment on each of the five counts of aggravated battery to a child, to run consecutively, for a total of 30 years' imprisonment, followed by 3 years of MSR.  A motion to reconsider the sentence was subsequently denied.

¶ 37     The defendant filed his notice of appeal on November 20, 2017.

¶ 38                                        II. ANALYSIS

¶ 39     On appeal, the defendant makes three contentions of error.  First, he argues that three of his convictions should be vacated pursuant to the one-act, one-crime doctrine.  Second, he asserts that the State failed to prove one of the charges against him beyond a reasonable doubt.  Third, he contends that he was denied effective assistance of counsel.

¶ 40                          A. One-Act, One-Crime Doctrine

¶ 41     The first issue raised by the defendant is whether his convictions on counts II through V should be vacated pursuant to the one-act, one-crime doctrine.[1]  Although the defendant admits that he forfeited this issue by not raising it in the trial court, he requests that we review it pursuant to the plain-error doctrine.  The plain-error doctrine permits a

_____

[1]As previously stated, count I alleged that the defendant "caused trauma to S.W.'s body" on or about February 14, 2016, causing S.W. to sustain rib fractures.  On appeal, the defendant does not claim that his conviction on count I violates the one-act, one-crime doctrine.  Further, because the physical act giving rise to count I occurred on a different date from counts II through V, *i.e.*, approximately one week before, it cannot be said that the count was based on the same physical act as the remaining counts.  Therefore, count I will not be discussed in this section.

15

reviewing court to review an unpreserved error when either: (1) an error occurred and the evidence was so closely balanced that the error threatened to tip the scales of justice against defendant, or (2) an error occurred that was so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process. *In re Samantha V.*, 234 Ill. 2d 359, 368 (2009). It is well-settled that violations of the one-act, one-crime doctrine "fall within the second prong of the plain error doctrine as an obvious error so serious that it challenges the integrity of the judicial process." *People v. Coats*, 2018 IL 121926, ¶ 10. Thus, despite the defendant's forfeiture, we will address the merits of his claim.

¶ 42 The one-act, one-crime doctrine provides that "a criminal defendant may not be convicted of multiple offenses when those offenses are based on precisely the same physical act." *Id.* ¶ 11. The definition of "act," for purposes of the one-act, one-crime analysis, is " 'any overt or outward manifestation which will support a different offense.' " *Id.* ¶ 15 (quoting *People v. King*, 66 Ill. 2d 551, 566 (1977)). Whether a violation of the doctrine has occurred is a question of law that we review *de novo*. *Id.* ¶ 12.

¶ 43 In evaluating whether multiple convictions violate the one-act, one-crime doctrine, we employ the following two-step analysis. *Id.* (citing *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996)). First, the court ascertains whether defendant's conduct consisted of a single physical act or separate acts. *Id.* If the court determines that defendant committed a single physical act, then it is required to vacate the lesser charge. See *People v. Donaldson*, 91 Ill. 2d 164, 170 (1982). However, if the court determines that the charges are predicated on multiple physical acts, the court then moves to the second step and

16

determines whether any of the offenses are lesser-included offenses. *Coats*, 2018 IL 121926, ¶ 12. If none of the offenses are lesser-included offenses, then multiple convictions are proper. *Id.*

¶ 44 In this case, the second amended indictment alleged that the defendant committed four acts of aggravated battery, which caused injuries to S.W. on or about February 23, 2016. In particular, count II alleged that the defendant "shook S.W." on or about February 23, causing him to sustain a "subdural hemorrhage." Count III alleged that the defendant "shook S.W." on or about February 23, causing him to sustain "a bilateral hemorrhage of the eyes." Count IV alleged that the defendant "caused trauma to S.W.'s body" on February 23, causing S.W. "to sustain rib fractures." Finally, count V alleged that the defendant "caused trauma to S.W.'s body" on February 23, causing S.W. to sustain "a lacerated liver." During trial, the State argued that the injuries that S.W. sustained on February 23 resulted from four distinct acts of aggravated battery.

¶ 45 With respect to counts II and III, the record reveals that the jury was shown the video recording of the defendant's interview with police, in which he admitted to shaking S.W. at least twice on the day that S.W. was taken to the hospital. The defendant also testified that he shook S.W. twice. Similarly, Dr. Shaw testified that S.W. suffered from two separate injuries that could have resulted from S.W. being shaken. Accordingly, we find that the evidence showed that the defendant committed two separate acts to support two separate offenses, one for each time that he shook S.W.

¶ 46 As to counts IV and V, Dr. Shaw testified, with confidence, that the rib fractures and lacerated liver S.W. sustained on or around February 23 were caused by abuse, rather

17

than an accident. Dr. Shaw further testified that these were not injuries that S.W. could have inflicted on himself by falling down the stairs, or in the bathroom. The victim was an infant who could not testify as to how each of the injuries was inflicted. However, there is no indication in the record that these injuries could have resulted from a single physical act. Thus, we find that the evidence presented at trial was sufficient to establish that the defendant committed two distinct physical acts that "caused trauma to S.W.'s body" to support separate convictions on counts IV and V.

¶ 47    Having determined that the defendant's convictions are based on multiple acts, we next determine whether any of the counts are lesser-included offenses of the others. Based on our foregoing analysis, that counts II through V were properly charged as four separate acts of aggravated battery to a child that occurred on or around February 23, 2016, it follows that they cannot be lesser-included offenses of the others. Accordingly, the separate convictions and sentences corresponding to these charges do not violate the one-act, one-crime doctrine.

¶ 48                    B. Beyond a Reasonable Doubt

¶ 49    The defendant also contends that the State failed to prove him guilty beyond a reasonable doubt as to count I, which alleged an aggravated battery to a child charge based upon the rib fractures S.W. sustained on or about February 14, 2016. If the State fails to prove a defendant guilty beyond a reasonable doubt, the conviction must be overturned. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). A jury's finding of fact will not be disturbed on appeal if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found defendant guilty beyond a reasonable doubt. *Jackson*

18

*v. Virginia*, 443 U.S. 307, 319 (1979). A reviewing court will not reweigh the evidence or make any credibility determinations regarding witnesses. *People v. Thomas*, 178 Ill. 2d 215, 232 (1997). Reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial (*People v. Campbell*, 146 Ill. 2d 363, 374-75 (1992)), and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction (*People v. Hall*, 194 Ill. 2d 305, 330 (2000)). Thus, the standard of review gives "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; see *People v. Nitz*, 143 Ill. 2d 82, 95-96 (1991). A conviction will be affirmed unless the evidence is "so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Collins*, 106 Ill. 2d at 261.

¶ 50    To convict the defendant of aggravated battery to a child, the State was required to prove that he, an individual over 18 years of age, knowingly caused great bodily harm to S.W., a child under the age of 13. 720 ILCS 5/12-3.05(b)(1) (West 2016). Acknowledging our deferential standard of review, the defendant does not dispute the age-related elements of the offense, the fact that S.W.'s ribs were fractured, or that such an injury qualifies as great bodily harm. However, the defendant argues that the remaining evidence does not support the rational inference that he caused the fractures. The defendant asserts that the State relied solely on text messages between Tierra and the defendant to prove that he caused S.W.'s older rib fractures.

¶ 51    Contrary to the defendant's contentions, the State presented circumstantial evidence that, when combined with the text messages, was sufficient to support the jury's verdict.

19

Tierra testified that about two weeks prior to S.W.'s hospitalization, she noticed "unusual bruises" on both sides of his body. Tierra thought the bruises looked like someone had been punching S.W. The defendant had been with S.W. prior to Tierra discovering the bruises. She found it unusual that the defendant failed to tell her about the bruises, or explain how S.W. was injured, so she took pictures of the bruises and sent them to the defendant. When asked what happened to S.W., the defendant could not explain where the bruises came from but instead became upset and defensive. At some point, Tierra held the defendant's hand up to the bruises, an act that is inconsistent with her testimony at trial that she did not think the defendant hurt S.W. Tierra testified that she had never harmed S.W.

¶ 52   The defendant contends that the State failed to prove that he caused S.W.'s older rib fractures because there was evidence that S.W. fell down the stairs less than two months prior to his hospitalization, and that he had fallen in the bathroom one or two weeks before he was hospitalized. However, the defendant's theory as to how the injuries occurred was dispelled at trial by Dr. Shaw's testimony, who explained rib cage fractures are rarely seen from falling, and that she "rarely see[s] rib fractures in children, period." Dr. Shaw was also questioned about the pictures Tierra took on February 16, 2016, of the bruising on both sides of S.W.'s body. Dr. Shaw observed that the photos depicted bruises on S.W.'s right and left chest and thorax, which were around the area of the rib cage. Dr. Shaw opined that injuries to those areas of a child's body are not usually caused by accidents.

¶ 53   In light of the foregoing, we cannot conclude that the evidence presented was so improbable or unsatisfactory so as to create reasonable doubt of the defendant's guilt on count I. Instead, we find that the State presented sufficient circumstantial evidence to prove

20

beyond a reasonable doubt that the defendant caused trauma to S.W.'s body on or about February 14, 2016.

¶ 54                              C. Ineffective Assistance of Counsel

¶ 55    The defendant lastly maintains that he was denied effective assistance of counsel. The defendant asserts that his defense counsel was ineffective by failing to object to Dr. Shaw's alleged hearsay testimony regarding the radiology reports pertaining to S.W.'s rib fractures.

¶ 56    As an initial matter, we address the parties' position that the defendant forfeited his claim of ineffective assistance of counsel, and thus, we should review this claim for plain error.  The plain-error doctrine applies to unpreserved errors, and in order to preserve a claim of error for appeal, a defendant must both object at trial and raise the error in a posttrial motion.  *People v. Wood*, 2014 IL App (1st) 121408, ¶ 53.  However, we find that to adopt the position advanced by the parties on appeal would be to require trial counsel to object to an alleged error that he committed.  "If we were to carry this argument to its logical extreme, it would mean that all ineffective assistance claims are unpreserved errors that must be reviewed for plain error, because it is not likely that trial counsel would ever object at trial on the grounds of his or her own ineffective assistance."  *Id*. ¶ 54.

¶ 57    Moreover, Illinois courts have found that ineffective-assistance claims and the plain-error doctrine overlap because a successful claim of ineffective assistance of counsel would necessarily satisfy the second prong of the plain-error doctrine.  *Id*. ¶ 56; *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 37.  Therefore, we will consider the merits of the defendant's claim without reliance on the plain-error doctrine.

¶ 58 Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and (2) a reasonable probability exists that, but for the error, the result would have been different (prejudice prong). *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011). A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Thus, defendant's failure to establish either deficient performance or prejudice will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 59 To establish deficiency under the first prong of the *Strickland* test, "defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). The reviewing court must evaluate counsel's performance from her perspective at the time rather than "through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). An evaluation of counsel's actions cannot extend into matters involving the exercise of judgment, strategy, or trial tactics. *People v. Penrod*, 316 Ill. App. 3d 713, 722 (2000); see also *Perry*, 224 Ill. 2d at 344. "Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable." *Manning*, 241 Ill. 2d at 335.

22

¶ 60    It is well established that "decisions regarding 'what matters to object to and when to object' are matters of trial strategy." *Perry*, 224 Ill. 2d at 344 (quoting *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997)).  Defense counsel's failure to object to testimony may be a matter of trial strategy and does not necessarily constitute deficient performance. *People v. Graham*, 206 Ill. 2d 465, 478-79 (2003) (citing *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991)).  Further, defense counsel's decision not to object to purported hearsay testimony involves a matter of trial strategy that will typically not support an ineffective assistance of counsel claim.  *People v. Theis*, 2011 IL App (2d) 091080, ¶ 40.

¶ 61    To establish prejudice, "defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Richardson*, 189 Ill. 2d at 411.

¶ 62    Here, the defendant specifically complains of the following testimony, which occurred after the State showed Dr. Shaw a diagram of the chest ribs and asked her to identify which of S.W.'s ribs were fractured:

> "Q.  *** is there any way to tell the age of these fractures?
>
> A.  Yes.  Our radiologists do the best job they can to describe them as newer or older.  They felt that the ones on the left were older than on the right, and by that they meant perhaps more than a week apart."

¶ 63    Our review of the record reveals that defense counsel's strategy as to count I was to challenge the State's evidence, not by disputing that an injury occurred, but by attempting to create reasonable doubt as to whether the defendant caused such injury.  In pursuing such a defense, defense counsel elicited testimony from Tierra that S.W. had fallen down the stairs less than two months prior to his hospitalization, and that S.W. had fallen in the

23

bathroom about one or two weeks before he was hospitalized. Counsel also questioned the defendant about S.W. falling down the stairs and attempted to have the defendant explain why he did not mention the fall during his interrogation. The defendant testified that he thought the bruises depicted in the photographs from February 16, 2016, were caused by S.W. falling down the steps. We find that an objection to Dr. Shaw's testimony would have been inconsistent with this theory of defense, and counsel's strategic decision not to object did not constitute deficient performance. See *Graham*, 206 Ill. 2d at 478-79; *Pecoraro*, 144 Ill. 2d at 13. The fact that counsel's defense strategy was unsuccessful does not render it unreasonable. See *Theis*, 2011 IL App (2d) 091080, ¶ 40. Because the defendant has not shown that defense counsel's performance was deficient, he has failed to establish that he was deprived of effective assistance of counsel.

¶ 64                                III. CONCLUSION

¶ 65    For the foregoing reasons, the judgment of the circuit court of Madison County is hereby affirmed.


¶ 66    Affirmed.

24